## PORTER v. PORTER.

No. 6887. Decided February 18, 1946. (166 P. 2d 516.)

See 27 C. J. S., Divorce, sec. 140; 17 Am. Jur., 174, et seq.

*Barclay & Barclay*, of Salt Lake City, for appellant.

*L. C. Montgomery*, of Heber, and *Edward W. Clyde*, of Salt Lake City, for respondent.

WOLFE, Justice.

Appeal from a decree granting plaintiff a divorce and alimony of $40 per month for two years and denying defendant a divorce on his counterclaim.

Plaintiff and defendant were married on December 5, 1942. It seems to have been a combination of ready-made families. The plaintiff had five children, four of whom were living with her. Their ages varied from a boy Milton, aged 19, down to a boy of 9 named Glen. The defendant contributed to the community two boys named Dwight and Dale, respectively, of the ages of 22 and 16, and a little girl of 3 named Sharon. These combined families for the most part lived in a five roomed house in Kamas. Milton, however, married soon after the marriage of the plaintiff and defendant and left, but the evidence discloses that his wife substituted for him as a part of the community for a time. Donald, defendant's second child, aged 16, was later inducted into the army which left three of the children of plaintiff and part of the time a daughter-in-law. Dwight, defendant's son, never did live at the home and Dale, on December 4, 1943, enlisted in the army, reducing defendant's share to Sharon.

The ground alleged by plaintiff is cruelty, causing great physical and mental suffering, to wit: Accusation of infidelity, being sullen and morose, absenting himself from the home for several months and on one occasion roughly handling the plaintiff.

The ground alleged by the defendant is also cruelty having deleterious mental and physical effects on him, to wit: Failure to prepare regular meals and for a time any meals at all; failing as a good housekeeper; being wasteful and frofligate with the money he earned; contributing food and some furniture to her relations and allowing them to live in the home; permitting waste to the home; being too familiar with another man; failing to take proper care of Sharon; destroying letters from defendant's sons; disavowing love and respect for him; taking in a boarder against his wishes, and pulling his ears. We think it unnecessary to review the evidence in detail. It is quite plain that this marriage—evi-

dently largely contracted for convenience—could not last. There was some clash of personalities but more potent was the commingling of two families in too small quarters, and the fact that he felt that she was not keeping up her end of the bargain and he was getting too little for what he gave. The overall picture must be gathered from the salient facts and those incidents which reveal the fundamental difficulties.

Shortly after marriage he installed the two families in a five room house at Kamas which he owned subject to a mortgage. He continued to work at Magna—afterward at Garfield, then at Bingham. He has steadily made good wages up to as high as $325 a month and up to December of 1943 contributed all but $16 or $17 a week to her and the family community. He came home generally on Saturday nights, sometimes late because he had to work overtime. He left again for his work on Sunday night or Monday morning. All the rest of the week he batched or boarded. Part of the time he lived in a bunk house. He appears to have been extraordinarily patient, slow to wrath, and not unkind. He brought candy home to the children. Evidently he was a sober, steady worker and willing to sacrifice. He lived for the first part of their married life on $16 and $17 a week, out of which he paid board and room at Magna and transportation between Magna and Kamas. All the rest he gave to her. She appears to have been an easy going woman, inclined to let things slide and not one to exercise discipline on the children. She apparently was one of those persons who liked to have a lot of people around. On Saturday nights and Sundays the girls had their boy friends in. There must have been no privacy for him. There were three or four females in the house all above 14 years of age and yet parts of the house were at times very untidy. One wonders what the defendant got out of the bargain. He worked hard all week, was never able to get home until Saturday night, at times late when he worked overtime. During the first part of his married life he gave the great bulk of his money to his wife without accountability, living himself frugally. He

made long trips each week back to Kamas, and yet his wife did not seem cooperative enough to get him a warm supper. On Sundays they cooked once and left it in the warming oven and all during the rest of the day the family "pieced" from the warming oven. There were no regular meals on that day. After Dale went away in December, 1943, there was only little Sharon of his children left. And he evidently did not think that she was getting proper care because on December 26th of that year he took her to his sister-in-law. After July 4, 1944, they ceased to cohabit and he slept in a small back room, for which later he competed with a boarder. True, he cut down her allowance to $5 a week on the apparent theory that he was getting the short end. He paid three months' light bill or what he thought was his share. He admits that he threw the dog out of the house one time because it was fed meat and candy on the rug but that seems to have been after frequent admonitions to not permit the dog to wangle sticky candy over the rug and after he had come to the end of his patience. There is no evidence that he was otherwise unkind to the dog.

As to his suggestions on accusations of infidelity there is evidence that he did express his suspicion that she was intimate with another man. There is no evidence that she was. She was perhaps indiscreet in going with that man to Salt Lake and Park City, especially after the defendant asked her not to do so. However, when she went there was someone else with them at times—one or more of the children. He thought there was some ground to suspect her. He says one time this same gentleman when admitted to the house approached the plaintiff with arms outstretched in such fashion as to indicate his greeting was going to be more effusive than a hand shake; that she was desperately trying to give him the "high sign" that defendant was home and that after a belated recognition of the meaning of the sign, he dropped his arms, relaxed and positioned himself on the lap of one of the daughters "mauling and hugging her." Defendant did not think this portended well for a purely platonic intention toward his wife nor that it boded well for the

daughter and so suggested to plaintiff, whereupon she replied that

"she [the daughter] would have to learn to take care of herself some time—might as well start now."

He wanted her to frame the marriage certificate which she insisted on keeping in her suit case, thereby arousing his suspicion as to whether she was not keeping it there so as to exhibit it in case of being questioned by a hotel clerk. There seems to be no reason why she should not have cooperated by acceding to his request to have it framed and hung on the wall.

From a reading of the record we would conclude that the evidence preponderated in favor of the defendant as to his being entitled to the divorce but the court had the witnesses personally before him. That element is especially potent in divorce cases. Since it is quite apparent that the matrimonial arrangement was a failure and there is evidence from which the court could conclude that she did suffer humiliation and distress from his accusations and suspicions which occasioned sickness, we must conclude that chivalrous considerations did not alone influence the judge to choose her instead of him as entitled to the decree.

In this case two persons of middle age each with families tried an arrangement in matrimony which proved unsuccessful. It lasted with interruptions and some rough sailing two years. During that time she and her children were provided with a home and for part of the time with very adequate support. He was unable to save any thing out of a good sized pay check. Even the mortgage on the house was only slightly reduced, which shows perhaps that he himself was not a top notch manager. Had he taken her in hand early in their married life the story might have been different. The decree gave him his home and his bowling alley of a clear value of approximately $3500 and required him to pay $40 a month for two years and $75 attorney's fees, a total of $1035. A good part of the

time he seems to have gotten no material and very little spiritual benefit out of the arrangement. She had a home for herself and children. She was not even bothered by his presence nor any of his children for a good portion of their married life. He was away earning money and concluded, we think, with considerable justification that his little daughter was not receiving the care which she should have. Under these circumstances we think $960 in alimony more than a fourth of all his property, was too liberal an allowance for the purpose indicated by the court, that is to give her a chance "to readjust her life to whatever it was prior to the marriage." We think six months at $40 a month is ample for that. The decree granting the divorce to the plaintiff is therefore affirmed with the modification that the alimony be reduced to $40.00 per month for six months instead of two years. Such is the order. Costs to the respondent.

LARSON, C. J. and McDONOUGH, TURNER and WADE, JJ., concur.