# GREENER v. GREENER et al.

No. 7265.   Decided December 2, 1949.   (212 P. 2d 194.)

572

574

See 27 C. J. S., Divorce, sec. 194. Grounds for divorce as statutory see note, 113 A. L. R. 1248. See, also, 17 Am. Jur. 165.

*Sandgren & Blackham,* Provo, for appellant.

*Arnold C. Roylance,* Springville, *Elmer L. Terry,* Provo, for respondent.

WOLFE, Justice.

Appeal by the plaintiff, Amy Elizabeth McKee Ostler Greener, from a decree of the Fourth District Court denying her a divorce from the defendant, Thomas Richardson Greener, and declaring that she had no interest in a fund of $19,879.27 held on deposit in the name of the co-defendant, James Aften Greener.

The two defendants are father and son. Plaintiff was married to Thomas R. Greener on October 2, 1946, when she was 65 and he was 79 years old. Each had been married previously, raised families to maturity, and had been widowed. Thomas owned at the time of his marriage to the plaintiff real and personal property of aggregate value approximately $30,000, represented by a homestead, some United States Bonds, and savings accounts in various banks. The bulk of his assets was in the form of savings deposits.

The marriage was not accepted with enthusiasm by the children of Thomas, and before the end of the year the parties had agreed to have plaintiff seek a divorce. It was difficult to find grounds, but on December 19, 1946, Mrs. Greener obtained an interlocutory decree based upon the impotency of Thomas. In connection with that action the defendant paid to the plaintiff $2000 as a property settlement. The separation, however, was as short-lived as the prior felicity and the parties were reconciled. On April 3, 1947, within the interlocutory period, the Fourth District Court, on petition of both parties, set aside the decree of divorce.

The resumed marriage was apparently more successful than it had been originally, but there were some misunderstandings and bickering. Matters were brought to a head in December, 1947, when the plaintiff made a trip to California to visit her children. While she was away Thomas withdrew from various savings banks the funds which had theretofore existed in the joint names of himself and plaintiff and made a gift of the money to James Aften Greener. The total amount of the transfer was almost $20,000. With the execption of his real estate and approximately $200 in bonds, Thomas thus divested himself of all his assets. However, it was not shown that he thereby disabled himself from supporting plaintiff, nor that he thereafter failed to support her.

Plaintiff, after hearing that Thomas had withdrawn the money from the joint savings accounts, brought this action for divorce and for setting aside, to the extent of her claimed interests, the transfer of said accounts to his son, Aften.

The complaint for divorce is founded upon the ground of cruelty, specific acts of cruelty being alleged as follows: That the defendant

"has been stingy, mercenary, and niggardly in his dealings with the plaintiff doling out to her sums for specific purchases and requiring her to account for and return to him any change therefrom;  *  *  * that he falsely accused the plaintiff on diverse occasions of robbing him of the sum of $2000 and has frequently quarreled with plaintiff over said sum; and that on one occasion since her return from California and during a quarrel, defendant  *  *  * threatened the plaintiff saying 'he might get desperate' and thereupon took a knife and with the blunt edge thereof drew it across the throat of the plaintiff and thrust it at her over her heart; that since the plaintiff's return from California, the defendant has continually quarreled with her and on one occasion told plaintiff that 'you can stay right here and I'll feed you or you can get out.'"

Also embodied in the allegations of cruelty was the statement that

"while she was on said trip [to California] the said defendant, for the purpose of defrauding the plaintiff of any and all her interest,

right and title in and to the sums in joint accounts herein referred to and with the intent and purpose of preventing the plaintiff from receiving any support and maintenance from him, the defendant did, on or about the 22d day of Decmber, 1947, transfer from the said joint account of himself and plaintiff the entire sums on deposit therein of a total in excess of $18,000 to his son, the defendant, James Aften Greener."

The plaintiff alone testified as to the acts of cruelty alleged in the complaint. The defendant testified that he made no threat against the plaintiff and that he had supplied her with everything she needed.

The court found that there was no knife-wielding incident or other acts of violence on the part of the defendant.

The court further found that the defendant did not

"at any time do any act or fail to do any act which he should have done which could have caused the plaintiff mental anguish or bodily suffering,"

and that he had not denied to her any of the necessities of life or her requested personal needs.

As we have held many times in actions involving divorce, where there is a conflict of testimony the findings of the trial court on material issues should be upheld unless they are clearly against the preponderance of the evidence. *Porter* v. *Porter,* 109 Utah 444, 166 P. 2d 516; ■ *Schuster* v. *Schuster,* 88 Utah 257, 53 P. 2d 428; *Steed* v. *Steed,* 54 Utah 244, 181 P. 445; and see concurring opinion in *Johnson* v. *Johnson,* 107 Utah 147, 152 P. 2d 426. Even though the record shows apparent inconsistencies in the testimony of parties, the trial court, having the witness before it, is in a better position than are we to ascertain whether these inconsistencies are more apparent than real as viewed in the light of the total testimony, and to determine whether contradictions are the result of a poor mode of expression, faulty memory, misunderstanding or self interest rather than untruthfulness.

It is further contended that the trial court erred in finding that the defendant was willing to resume marital relations. While it is true that where sufficient grounds are proved the trial court may well conclude that an elderly couple who have wed late in life and who seemingly cannot live peaceably together should be granted a divorce, the refusal of the trial court to do so cannot be overturned unless that court has abused its discretion by denying the divorce when the evidence demands that it should have been granted. The fact that the parties do not care to live together is not, per se, a reason for the granting of a divorce, though it might be a reason for their living apart and may be a sufficient basis for an action for separate maintenance. As it was said in *Hyrup* v. *Hyrup*, 66 Utah 580, 245 P. 335, 338,

"it is not enough that they both desire a divorce or refuse to live with each other. Courts are not authorized to grant divorces except for the particular causes prescribed by law, and then only when the grounds or cause for divorce is proved by substantial and satisfactory evidence."

Nor is *Lundgreen* v. *Lundgreen,* 112 Utah 31, 184 P. 2d 670, cited by plaintiff, to the contrary. That case points up once again the broad discretion vested in the trial court as to the propriety of granting or refusing a divorce.

Plaintiff next assigns as error the refusal of the trial court to find that she had an interest in the savings accounts transferred to James Aften Greener, and to set the transfer aside, as fraudulent, to the extent of her claimed interest therein.

This assignment of error is based on two contentions, the first being that the plaintiff acquired, by operation of law, because of the marriage, rights in the personal property of her husband. The second contention is that she became a true "joint owner" of the deposits because of the agreements signed by the parties when the accounts were transferred to their joint names.

Answering the first contention: In this state a wife has only such rights in the property of her husband as are given by statute. The husband is otherwise complete owner and may dispose of his property as he desires, either by will or inter vivos, to the exclusion of his spouse. ▉■ In Utah the rights of the wife are confined to a homestead interest and "stautory dower," i. e., one-third interest in the husband's real property. The New York cases cited by appellant represent local interpretation of a peculiar decedent estate statute and for that reason are without weight in the instant case. See Leach, Cases on Wills, 2d Ed., p. 19. Our legislature has not seen fit to give a wife such incidents of marriage as plaintiff asserts.

The second contention that the agreements in this case made in joint form with rights of survivorship were intended to accomplish in fact the legal import of such agreements, to wit, vest in each party the present ownership of one-half of the account, is countered by the contention that the parties did not so intend.

The primary question as to the passing of any interest has been often litigated in this and other jurisdictions and it is generally held that an account transferred by the owner to the names of himself and another may become the "joint property" of both with at least *some* of the ■ incidents of a joint tenancey in real property. *Holman* v. *Deseret Savings Bank,* 41 Utah 340, 124 P. 765. Most of these cases involved actions between a surviving cotenant and representatives of the deceased depositor and where the survivor prevailed it was because the court determined that an interest had passed anterior to the death of one of the joint owners. To have found that the interest passed at the time of the death would have been to validate the attempted transfer as a testamentary disposition without the statutory formaliies required by the satutes on wills. In finding the necessary inter vivos transfer different courts have relied upon the law of trusts, gifts or contracts. The cases and theories supporting their conclusions are col-

lected and annotated in several volumes of the American Law Reports. See 48 A. L. R. 191, 66 A. L. R. 822, 103 A. L. R. 1124, 135 A. L. R. 993, 149 A. L. R. 879.

A minority of courts hold that by the transfer of the account a valid express trust has been created with the bank as trustee, a theory that has been criticized for torturing a trust from an imperfect gift, and for finding a trust where there is no trust property or res. Another segment of decisions has determined that the transfer amounted to a contract for the benefit of a donee, with the bank as the promisor.

The most widely accepted view is that the property passes as a gift inter vivos, provided there is a donative intent and delivery. *Christensen* v. *Ogden State Bank,* 75 Utah 478, 286 P. 638. Recognition that actual manual delivery of a chose in action is impossible has led to a determination that relinquishment of control of the bank passbook is a legally sufficient symbolic delivery. And even where the donor retained the bank book it has been held that the delivery was sufficient, on the theory that the parties have an equal right to the book and delivery to either of the co-depositors is delivery to both. *Holt* v. *Bayles,* 85 Utah 364, 39 P. 2d 715. When this theory of delivery is adopted there is no substantial difference between the operative facts necessary for a gift inter vivos and for third party beneficiary contract, the validity of the transfer in each case hinging on intent.

If there is no agreement between the parties which has been reduced to writing, the only documentary evidence being the form of the deposit (e. g. "in account with A or B" with no provision concerning survivorship), the intent of the owner in converting the account to a joint one must be shown by extrinsic evidence as there is no presumption that a "joint tenancy" or gift was intended. *Holman* v. *Deseret Savings Bank,* 41 Utah 340, 124 P. 765; *Boyle* v. *Dinsdale,* 45 Utah 112, 122, 143 P.

136, Ann. Cas. 1917E, 363; *Olson* v. *Scott,* 61 Utah 42, 210 P. 987; *Christensen* v. *Ogden State Bank,* 75 Utah 478, 286 P. 638.

Where, however, the parties have entered into and expressed in writing a complete agreement which is clear as to the intent and purpose of the deposit, the intent so expressed will be given effect unless the instrument is successfully attacked for fraud, mistake, incapacity, ▮ or other infirmity, or unless it is shown by "clear and convincing proof" that the parties intended the instrument to have a different effect from that expressed. *Neill* v. *Royce,* 101 Utah 181, 120 P. 2d 327. And where one of the co-depositors has died prior to the assertion of conflicting rights it has been held that there is a conclusive presumption that such integrated agreement sets out the complete intent of the parties. *Holt* v. *Bayles,* 85 Utah 364, 39 P. 2d 715. The reason for the conclusive presumption, in the absence of statute, may not be clear for seemingly death would have no effect on the intent with which the joint deposit was created. However, since both of the parties in the instant case are still alive, we need not concern ourselves with the reasoning employed to support the conclusive presumption of intent where one of the parties has died before the assertion of conflicting rights.

Thomas R. Greener, prior to his marriage to plaintiff, had approximately $20,000 on deposit with six different banks and loan associations in Salt Lake City and Springville. Shortly after the marriage the plaintiff accompanied defendant on a tour which took in each of the depositories, and at each stop the parties changed the accounts from the individual name of Thomas to their joint names. In each instance, too, the parties signed "joint tenancy agreements" which detailed the various rights, powers and immunities of the parties and the depositories. When Mrs. Greener sought her first divorce her name was stricken from the accounts, but after the reconciliation the parties again traveled the circuit, the depositories were revisited,

the accounts reconverted to joint ones, and the agreements re-executed. This was the situation when Thomas tired of the arrangements, withdrew the money and gave it to his son.

The court below, and the parties on appeal, adopted the theory that the agreements showed an intent that the parties intended to agree to all the legal import of a joint account with right of survivorship, that is to say that Mrs. Greener was to acquire a one-half interest in the whole account, with a right of survivorship, and that her interest was indefeasible if this were the true intent. It was also the theory that *Neill* v. *Royce,* supra [101 Utah 181, 120 P. 2d 331], controlled and that plaintiff would prevail unless there was "clear and convincing proof" that the intent was different from that expressed in the agreement.

We are of the opinion that the six joint deposit agreements above mentioned do not differ materialy from those agreements which were before us in the case of *Holt* v. *Bayles* and *Neill* v. *Royce,* supra, but the circumstances of this case are quite different from those in the *Royce* case.

As before stated there are six agreements involved in this litigation, all of them being between partcular banks or loan associations wherein Thomas Greener previously had his accounts, and the joint parties. The language of the agreements vary in some details and much of the language in the various agreements is not material to the question now before us.

All of the instruments provide that the parties hold as "joint tenants with right of survivorship," five of them adding the negative phrase "and not as tenants in common." In addition, there are clauses which define the rights or powers of the parties, with some variations.

The agreement with the Zion's Savings Bank & Trust Co. of Salt Lake City provides that there is a

"*right* of either of the undersigned to draw out the whole or any part of said sum at any time or times during the life of both;"

it is also agreed that

"either of the undersigned may draw the same, or any part thereof, during the lifetime of both."

In the agreement with the Deseret Federal Savings and Loan Association is found a provision that

"any one of the undersigned who shall first act shall have *power* to act in all matters related to the membership * * * whether the other person or persons named in the certificate be living or not."

There are identical provisions in the agreements with the American Savings & Loan Association and the Prudential Federal Savings & Loan Association.

The Springville Banking Company agreement provides that

"the entire account or any part thereof may be withdrawn by, or upon the order of, either of us or the survivor."

The agreement with the Western Loan and Building Company contains a clause to the effect that the sums deposited shall be

"subject to the order of withdrawal of either of them, or the survivor of either of them,"

together with a provision that either or the survivor may

"assign any part of the whole."

We shall first deal with these agreements as if they contained only the clause providing that the parties hold as "joint tenants with right of survivorship" regardless of the negative phrase reading "and not as tenants in common" which phrase we think neither adds nor detracts from the legal import of the first above quoted clause but simply lends emphasis to it.

We shall later deal with the clauses in the agreements which provide for either having the right to withdraw all or any part of the account or equvalent expressions.

The trial court concluded that the evidence demonstrated clearly and convincingly that the parties did not intend that any present interest in the joint chose in action (indebtedness of the bank) should vest in the plaintiff. Judge Dunford who tried the case has given us in a very helpful memorandum of decision, a clear picture of the processes of his mind in the considering and weighing of the evidence by which he concludes that the proof is clear and convincing *"against* the presumption that full joint tenancy was intended." (Emphasis added.)

The trial judge in analyzing the evidence respecting this matter of whether the presumption of a present gift has been overcome by clear and convincing proof says in this memorandum of decision:

"The defendant testified in effect that it was their intention merely to avoid probate and that they did not intend to pass a present right to any of the funds. The plaintiff directly contradicts him and relates the circumstances of the courtship, the pre-marital offers, and promises which ran the gauntlet from an offer to pay plaintiff $150 per month, to 'she can have everything I've got and the old man thrown in;' and that after resumption of the marital relation they went back to each depository together and that at each she asked the clerk or agent the same question as to whether placing her name back on the records and pass books gave her the same rights to the funds as the defendant had, to which inquiry she received their separate assurances. This is directly denied by the defendant, and it is significant that plaintiff produced no corroboration for this important evidence, even though it would normally appear that in view of the frequent changes in the status of the accounts at least some one of the agents would have remembered the circumstance. I cannot find it is a fact that such inquiry was made. Nevertheless, so far, the evidence against joint tenancy is anything but clear or convincing. Looking further, however, we find that two of the grounds of cruelty alleged and testified to are: First, his stingy and niggardly attitude. And second, his constant nagging and bickering over her return of the $2,000 he paid her.

"The stipulation of the parties in the file shows that $18,151.48 was on deposit in the several accounts on December 22, 1947, and the record shows that there was a joint checking account in the bank at Springville. The deposit books were kept in the bookcase at the home of the parties within easy access of the plaintiff. If she had acquired

a present joint title with defendant in all of these funds, would she have endured his alleged stinginess? Would she have asked him for every penny spent for groceries, and accounted to him for the change to the penny? Would she have bought only one pair of stockings and one underslip during their whole marriage? The answer seems obvious. If she had known that the accounts were hers as much as his, she would have bought what she wanted. She is an intelligent, vigorous and strong-minded woman, and would not have endured such penury as she describes if she had understood from their arrangement that she was equal owner of these funds.

"Likewise as to his quarreling and bickering over the $2,000 settlement in the first divorce, assuming that to be true, would she have endured it knowing that she had the present right to draw the $2,000 from one of the depositories and give it to him? There is little logic to the thought.

"There was nothing new in the relationship between the parties respecting the funds after dismissal of the first divorce action, as the court has heretofore announced. If she now owns a present joint tenancy in the accounts, she did so at the time she made settlement on the first action. There is ample evidence from which to conclude that the accounts were importantly larger at that time, yet she accepted $2,000 as full settlement of all property rights. Would she have done that if she were entitled to joint ownership with him in funds that approached $30,000? Of course she would not.

"The court must conclude from the pleadings and testimony of the plaintiff herself that she had no such understanding, and where the true purpose is testified to by the defendant with no impeachment that the intention of the parties was that her rights should arise at his death, it appears that the standard of clarity and certainty has been met and the presumption of the agreements between the parties and the depositories overcome.

"Thus the court holds that defendant was and is the sole owner of the funds, and his withdrawing them was not against any present right of the plaintiff, whether surreptitiously or not, and thus was not cruelty."

This is an equity case. We could therefore ourselves determine from the record what the underlying facts are even though there is a conflict of evidence. But in determining the basic or evidentiary facts as distinguished from the conclusions which the trial court drew from them, the rule of *Stanley* v. *Stanley,* 97 Utah 520, 94 P. 2d 465, applies. In the instant case there were con-

flicts in the testimony of Mr. Greener and Mrs. Greener as to what conversation went on preceding their first marriage, circumstances and conversations attending the courtship regarding promises he made her, and also as to what the conversations were between her and the personnel of the different banks in regards to her rights under the agreement which she and Mr. Greener signed and all of which were made in his presence. These were the chief events in reference to the basic facts as to that part of the case which related to matters which would throw light on the intention of the parties respecting the agreements.

The trial judge had the wintesses before him. He could note their demeanor on the stand, judge their ability to register and retain impressions and to transmit them intelligently and to their candor or lack of it. In cases in which the emotions of the parties are apt to influence their testimony the opportunity to observe them in the court room and especially on the witness stand is of great importance. There are cases in which we may be in equally as good a position as is the trial court to make the inferences from what are usually called basic, evidentiary, or underlying facts. For instance, where the evidence is all documentary and no evidence has been introduced as to the circumstances surrounding the making of the instruments or of any condition on which it is claimed their effectiveness depends also, where there are circumstances attending the evidence which mark it definitey for one side or the other in respect to which circumstances the question of credibility of witnesses could play no part; or where all the evidence is preserved in physical form and there are no issues concerning it in which the credibility of witnesses could play a part. In the cases just mentioned and in some others perhaps which might be thought of we would seemingly be in as good position as the trial court to make inferences and deductions from the evidence. But the instant case is not one of these; in this case, we must rely largely on the trial judge to resolve the conflicts.

In reading the record we find no marked preponderance of the evidence favoring either Mr. or Mrs. Greener's version of what the parties said or did when they visited the banks together to execute the agreements. But as the trial court states in his memorandum of decision, none of the agents of any of the six banks were called by Mrs. Greener to verify her testimony as to the questions she claimed she asked those representatives nor as to the replies they gave or what Mr. Greener may have said. Such corroborating testimony from disinterested witnesses would have been valuable to her if made in the presence of her husband.

Contradictions in the evidence of both parties concerning what was said between them while they discussed the settlement of property rights during the second trial marriage and afterward about his allegedly asking for the return of the $2000 and her testimony as to his being stingy and niggardly must also be largely for the trial court to resolve. Here again were basic facts for the trial court to find from the evidence after considering the credibility of both parties. We cannot say that the court was not justified in finding that Mr. Greener was not so parsimonious as she claims, although the court found that frugality was a habit with him.

We have considered above the basic facts in regard to which the court had to resolve conflicts (and for that reason called herein "resolved facts") as a basis for drawing conclusions in order to establish the next level of facts which we herein designate as intermediary facts.

In that stage where the court draws conclusions from the basic facts previously found by him, we are on a more equal plane with him. We are, as to the deductions he draws from the basic facts, in much the same position as he, if we accept the basic facts as found by him.

We shall call the finding of the court that Mrs. Greener made no inquiry from the representatives of the banks as to her rights under the contracts' intermediary fact A,

although technically it is resolved rather than a deduced fact. Intermediary fact B in the court's pyramidal reasoning is his deduction that Mrs. Greener must have had the belief that she did not have any present ownership in the funds (bank indebtedness) or she would not have asked him for every small item of her personal apparel nor for pennies to get groceries. The court remarked that the deposit books were accessible to her and if she believed she could draw out half of the account, she would have done so rather than endure what she claimed was his penury.

What we shall call intermediary fact C was like unto fact B, deduced from underlying facts. The trial court assumed as true for purpose of deduction that there had been quarreling over the $2,000 given to Mrs. Greener as a property settlement in the first divorce and then concludes that she would not have

"endured it knowing that she had a present right to draw $2,000 from one of the depositories and give it to him."

There are, of course, other deductions which the court could have made in arriving at the intermediary facts which might be opposed to those he did make. He could have concluded that Mrs. Greener was a sensitive type of woman and would rather have endured her husband's stinginess than to arouse irritation, or perhaps rebellion, if he found her drawing the money even though she knew she owned part of it, or that she knew he too had the right to withdraw any or all the moneys and did not want to arouse him to do that because she could hope to outlive him and thus gain the whole of it for herself and children; that if she "beat him to it" and drew it first, it might or probably would have started protracted litigation; or even a fourth deduction as to her motives for not drawing it, assuming she believed she was a joint owner, would be that she was a woman of very high ethical principles and that she felt it "not quite cricket" to deprive him and his children of money that he and his first wife had so prudently

garnered over a lifetime. But the deductions made by the judge seem the more likely from the viewpoint of a practical "vigorous and strong-minded woman," and what might be expected from human nature generally. Mrs. Greener was frank in stating that after the first failure of the marriage in which defendant's money played no part with her, she determined when she agreed to try it again that she would share in his property.

The fourth intermediary fact arrived at by the court, this deduction which we shall call fact D, is that Mrs. Greener would not have accepted $2,000 settlement in the first divorce action if she believed she had at that time a joint ownership in about $20,000 of bank indebtedness. The court reasons that if she had a present interest in the second set of joint accounts that were created, she must also have had the same interest in the first set. Certainly if she had reason to think or believe that she had a present half interest in $20,000 of funds, it is very improbable that she would have accepted $2,000 in settlement of her property interests. While her evidence of her making inquiry from the banks as to the right to draw relates to the second set of accounts, it is perhaps fairly inferable on the strength of her statement that he told her before the first marriage that she could have everything he had "and the old man thrown in" that he was just as generous and as intentional respecting the first set of joint agreements as she claims he was as to the second. And if the court could infer the fact that she settled for $2,000 when she had a right about to $10,000, it is indeed a very potent inferred fact. However, in fairness to her it seems very plausible that after she had one "go" at marriage with him on what she claims was on a companionship rather than a property motive, and she thought that marriage was broken up largely by the interference of his children, she might well want to protect herself property wise when she consented to try it again.

The court used these four intermediary facts—A, B, C, and D—to conclude as to the pinnacle or ultimate fact and

arrives at the determination that by clear and convincing evidence it was shown the parties did not intend that Mrs. Greener was to have a present half interest in the funds, but that Mr. Greener "was and is the sole owner of the funds."

We do not mean to imply that the resolved and inferred facts found by the court arranged as set out above actually represent the order and precedence in which said findings emerged from the trial judge's mind. In the actual thinking processes the resolved and deduced facts do not arrange themselves in such an orderly hierarchy. The issues of fact tendered by disputes in the evidence are resolved not only by weighing evidence against counter evidence on those issues, taking into consideration at the same time the credibility of the witnesses who gave the evidence, but also, by throwing on the evidence in dispute the light of any other evidence which may illuminate it; and further, by choosing among possible inferences which may be drawn from any resolved fact (result of a determination of an issue of fact), the seemingly most reasonable, natural and logical inference or inferences and then by turning back the light of those inferences (deduced facts) on any of the basic facts and on each of the other deduced facts if they tend to aid in the interpretation of such facts. The process of thinking is a tentative process—a process of placing before the mind for testing provisional or tentative combinations before the final or complete pattern evolved by the thinking is fixed.

To concretely illustrate: Fact A above (really a basic fact but in our nomenclature included among the deduced or intermediary facts) may be the result not only of a resolution of the issue of facts tendered by the conflicting evidence of Mrs. Greener's alleged inquiries to the representatives of the bank and Mr. Greener's denials thereof, but of any other evidence which tends to throw light on that issue as well as any light which the inferred or deduced facts may throw on it. It is the interplay of evidence on

evidence, or of evidence on inferences, or of inference on evidence which brings the final result. Our arrangements in a hierarchy of basic and deduced facts and finally of the pinnacle or ultimate fact does not necessarily represent the manner, order or precedence in which the facts were evolved from the judge's mind, but rather a pattern or structure of the way the basic and deduced facts fall into an arrangement after the thinking processes are completed as revealed in this particular case by the judge's memorandum of decision.

Certainly the reasoning in the memorandum of decision is cogent. The only remaining question is—was it clear and convincing? Certainly it was convincing to the judge. Not every fact in the pyramid of reasoning need itself be clear and convincing. We have an example of that in this case. The trial judge in his memorandum of decision, after discussing the reasons for arriving at Fact A, states,

"Nevertheless, so far, the evidence against joint tenancy is anything but clear and convincing."

There may be cases when the vector sum of the probative forces as to several or even a majority of facts, especially intermediary facts may pull away from the ultimate or pinnacle conclusion found by the court, and yet the probative force of one or more additional facts be so powerful as to leave no reasonable doubt in the mind of fact finder not only as to where the preponderance of the evidence lies, but as to the proof being convincing respecting the ultimate fact to be found. That proof is convincing which carries with it, not only the power to persuade the mind as to the probable truth or correctness of the fact it purports to prove, but has the element of clinching such truth or correctness. Clear and convincing proof clinches what might be otherwise only probable to the mind.

We have no measuring rod to lay along side of the proof to ascertain whether it meets the various tests signified by the terms "barely" or "merely" or "slightly" prepon-

derating or "fairly," "greatly" or "overwhelmingly" preponderating. Nor can we measure the content of such terms as "clear and convincing," "beyond reasonable doubt" (which we take to mean the same as free from reasonable doubt), "unquestionably convincing," etc. These terms deal with states of mind and to a degree vary as to the content put into them as minds vary. They all have implicit in them the idea of comparativeness, each with other standards, signifying more or less degrees of proof.

But for a matter to be clear and convincing to a particular mind it must at least have reached the point where there remains no serious or substantial doubt as to the correctness of the conclusion. A mind which was of the opinion that it was convinced and yet which entertained, not a slight, but a reasonable doubt as to the correctness of its conclusion, would seem to be in a state of confusion.

The attention given in this opinion to the reasoning of the trial judge in his memorandum of decision is some indication of the care we have bestowed on the question of whether his conclusion was supported by clear and convincing proof. The court's findings on the basic facts are such as a reasonable mind could arrive at. Under the rule of *Stanley* v. *Stanley* we must accept his findings on the basic facts. The reasoning by which he arrives at the intermediary facts, A, B, C and D, meet the test of being those which a reasonable mind could reach, if indeed they are not the most logical and natural at which such mind would arrive once the basic facts are fixed. And certainly on the strength of the intermediary facts from which the final conclusion of fact is to be derived, such conclusion reached by the court meets the test of being supported by clear and convincing proof.

In addition to facts A, B, C and D, there is the direct testimony of the parties as to the intention. Mr. Greener testified the agreements were made for the purpose of

avoiding probate and not to pass any present right to any of the funds. She testified to the opposite and to substantiate her statement that it was Mr. Greener's intention to give her a present one-half interest relates the circumstances of the courtship, his eagerness to wed, and his promises that "she can have everything I've got and the old man thrown in." Copies of all six agreements were introduced in evidence. All of them were on printed forms containing spaces for names, amount and signatures, previously of course prepared by the banks and loan associations for the purpose of those who desired to open up joint accounts. Most of them were on cards evidently designed to fit into a signature reference file.

The clause on the card filed with the Zion's Savings Bank & Trust Company entitled "Joint Tenancy Agreement" provides:

"We the undersigned hereby jointly agree and certify that we have this day deposited with the Zion's Savings Bank & Trust Co., of Salt Lake City, the sum of $.............., said money and all other sums at any time deposited, added, accrued or accumulated on said account hereby evidenced shall be subject to the By-Laws of said bank, as now existing or may be enacted or amended from time to time hereafter. The undersigned own the same as joint tenants with the right of survivorship and with the right of either of the undersigned to draw out the whole or any part of said sum at any time or times during the life of both, and upon the death of either of the undersigned, the survivor shall own absolutely and be entitled to the whole of the residue of said deposit, and said residue shall be payable to and be drawn by such survivor at the pleasure of said survivor, * * *."

Undoubtedly these agreements were intended to protect the banks and loan associations from liability to either party or the personal representative of the heirs of either party because of withdrawals.

But the unequivocal wording of the agreement as said in *Neil* v. *Royce*, 101 Utah 181, 120 P. 2d 327, raises a presumption that as between the depositors themselves they own equal interests. And this presumption pertains even though the agreement provides that either may draw out the whole or any part of said sum. This

latter provision was probably included because the bank was unwilling to assume the burden of determining whether either of the co-depositors had drawn out to the full extent of his particular interest.  But the fact that each of the owners of a joint credit agrees that the other joint owner may reduce the credit to money beyond the amount of his limited interest, is not inconsistent with the concept that each has *only* a half interest, although the inability of the joint owner, the part or whole of whose share is drawn out by the other, to follow the money or recover it or claim as his, goods purchased with it, may have the practical effect of depriving him of his share.  But in the most instances where this type of account is opened with a bank, the parties who would naturally share the credit are in a relationship of the utmost confidence bred from years of close relationship such as husband and wife of long standing.  There is then no reason why each should not fully trust the other and why there should not be an express intention for each to give the other full access to the whole credit so that emergencies such as sickness or accident or incapacity of one may leave the other free to use the credit to the full.

We see no reason why the provision that permits each to draw the whole or any part of the bank credit should disturb the presumption of *present* joint ownership. In this case presumptively Mr. Greener intended to ■■ give his wife, presently, half of the bank credits. There is no reason why the rule should not pertain that the presumption of intention to pass a present interest may be overcome by clear and convincing evidence of a different intent.

The testimony of Mr. Greener that the joint deposit was opened for the pupose of avoiding probate, must, of course, be examined in the light of the fact that he probably expected to die first and must have realized that then his wife would take all.  But what he evidently did not realize, was

that such intendment would involve a testamentary disposition and hence would be void because not executed according to statutory conventions. He also did not realize as he well might not have, being a layman, that a truly intended joint account passes a present interest and not one at death and that the survivor takes all, not because the other's interest passes by death, but because one of the joint owners has by death dropped out of the owning unit as if a Siamese twin had been cleaved from the physical union and unit.

We think that the evidence and the conclusions which could reasonably have been made therefrom were such to permit the mind of the trial judge to attain as a reasonable man to the state of being clearly convinced of the intent of the parties not to pass a present interest in the six bank accounts.

It could be clear and convincing to a reasonable man trained to weigh evidence that this old farmer with a family of children who had developed over a lifetime the habit of frugality and with a feeling of security in his sense of possession but lonely and desirous of affection and companionship and willing, perhaps, to go far in his promises to obtain them, did not intend to make a present gift to his new wife nor when "hope triumphed over experience" even with the same woman to allow hope to blind him to the results of his experience to the extent of a present parting with a half of his bank credits. Therefore, we think that the lower court must be upheld in his holding that the presumptions arising from the agreement joint in form treated in *Neill* v. *Royce,* supra, have been overcome by clear and convincing evidence.

Judgment affirmed. Each party to bear its own costs.

PRATT, C. J., and LATIMER and McDONOUGH, JJ., concur.

WADE, Justice (concurring).

The trial court determined two controlling issues of fact against plaintiff: (1) That the defendant was not guilty of the acts of cruelty claimed by plaintiff. A contrary finding on this issue would have clearly entitled plaintiff to a divorce. (2) That the parties did not intend to create a joint ownership in the moneys on deposit in the joint bank accounts. A contrary finding on this issue would have required the court to find that plaintiff was half owner of those moneys. The second proposition, the trial court held and we hold, requires clear and convincing evidence of a contrary intention in order to defeat her claim of joint ownership although the evidence is clear that originally all of this money belonged to him. From a reading of the record without the benefit of seeing and hearing the witnesses give their testimony I would have decided both of these issues the other way, but in view of the fact that the trial judge saw and heard the witnesses and therefore was in a better position to evaluate the weight to be given to their testimony, I conclude his findings on those issues are supported by the preponderance of the evidence.

As pointed out in the prevailing opinion we have many times held that where there is a conflict in the testimony on a material issue the findings of the trial court in a divorce action should be sustained unless they are clearly contrary to the preponderance of the evidence. But I wonder if that is the test which should be applied in a case of this kind on a question of fact as distinguished from an issue which requires the exercise of the discretion of the trial judge. Under Art. VIII, Sec. 9, of our State Constitution in

"equity cases the appeal may be on questions of both law and fact; in cases at law the appeal shall be on questions of law alone."

While I think it would be better in all cases on appeal, whether legal or equitable, if we were to follow the test above stated, which I understand to be the rule in the federal courts, I do not think that is the rule required either

in law or equity cases under the above constitutional provision. Such a practice would greatly simplify the problems of this court and would have very little, if any, effect on the result. It is impossible for any court or judge to consistently determine in all cases whether they are actions at law or suits in equity and there seems to be no good reason for making such distinction. Under the above constitutional provision, as I understand it, in law cases on appeal we must sustain the findings of the trial judge if such findings could be reasonably found from the evidence, but in equity cases we must independently determine the issues of fact from a review of the evidence, keeping in mind that the trial court is in a better position than we to evaluate the weight of the testimony of the various witnesses. *Stanley* v. *Stanley,* 97 Utah 520, 94 P. 2d 465; *Walton* v. *Coffman,* 110 Utah 1, 169 P. 2d 97.

The rule stated above, while proper on matters involving the discretion of the court, is not the rule applicable in either law or equity cases. In my opinion all cases are either law or equity in their nature and we should apply one or the other rule. A divorce action is statutory but highly equitable in its nature and therefore I conclude that we should apply the rule provided for equity cases by independently determining the issues of fact from the record giving the proper weight to the findings of the trial judge who has seen and heard the witnesses give their testimony.

I agree that where a deposit is held as a joint bank account under a written instrument signed by both parties thereto, which unambiguously provides that such deposit is their joint property and belongs to the survivor on the death of one of them, that clear and convincing evidence of a contrary intention is required to sustain a holding that during the lifetime of both parties such account was still the sole property of the original owner. However, we should not overlook the fact that in previous cases, involving a gift after the death of the donor, we have applied a contrary rule. Except for the case of *Holt* v. *Bayles,* 85 Utah 364, 39

P. 2d 715, which held that under such instrument the intention of the parties is not material because the terms of a written instrument cannot be varied by parol evidence, *Neill* v. *Royce*, 101 Utah 181, 120 P. 2d 327, which announced the rule here followed, our previous cases have approached the question from a different viewpoint and required clear and convincing evidence from the party claiming a gift. In such previous cases, we have held that even in the face of a written instrument signed by the original owner which without ambiguity provided that the funds in the joint account belonged to either or the survivor, of the parties thereto, still in order to sustain a claim by the survivor after the death of the original owner it must be shown by clear and convincing evidence that the original owner intended to make a present gift of some legal or equitable title to the funds in the account. *Christensen* v. *Ogden State Bank*, 75 Utah 478, 286 P. 638; *Olson* v. *Scott*, 61 Utah 42, 210 P. 987. See also the following cases to the same effect with slightly different fact situations: *Wood* v. *Wood*, 87 Utah 394, 49 P. 2d 416; *Helper State Bank* v. *Crus*, 95 Utah 320, 81 P. 2d 359; *Boyle* v. *Dinsdale*, 45 Utah 112, 143 P. 136; *Holman* v. *Deseret Savings Bank*, 41 Utah 340, 124 P. 765.

What differences in the fact situation are necessary in order to change the requirement of clear and convincing proof from the parties on one side of such a controversy to the parties on the other side is not clear from these cases. Apparently the court failed to notice that such a shift had occurred. Possibly, where the original owner of the funds in the account is still alive and the court has the benefit of his testimony and there is a consideration for the transfer and no gift is involved, the original owner should be required to prove an intention contrary to the express terms of the written instrument by clear and convincing evidence, whereas, where a gift is involved, after the death of the donor a person claiming a gift during his lifetime, even though supported by the terms of an unambiguous written

instrument, should still have to prove an intention to make a present gift by clear and convincing veidence. Such a distinction would harmonize this case and *Neill* v. *Royce,* supra, with *Christensen* v. *Ogden State Bank,* supra, and *Olson* v. *Scott,* supra. But in *Holt* v. *Bayles,* supra, the original owner was dead and a gift was involved but there we went further than to require clear and convincing proof of an intention contrary to the written instrument and held that since the terms of an unambiguous written instrument may not be varied by parol evidence, evidence of such intention would be immaterial. So I have great difficulty in reconciling *Holt* v. *Bayles,* supra, with the *Christensen* and *Olson* cases and the other cases to the same effect cited above.