# In the Matter of the Estate of MATHILDE BOSSELMAN KELLEY, Deceased.

Surrogate's Court, Westchester County, January 25, 1933.

*Murray L. Jacobs*, for Manufacturers Trust Company, executor.

*Cornelius J. Buckley*, for Adelaide E. Frees, objector.

*Fogarty, Quel & Devlin*, for First National Bank of Yonkers.

*Olvany, Eisner & Donnelly*, for Irving Trust Company.

*Charles A. Voss*, special guardian, for Harold Frees.

*Walsh & Baird* for Timothy H. Kelley.

SLATER, S. Adelaide E. Frees, the residuary legatee, filed objections to the account. Upon the hearing, objection " three " was withdrawn. The other objections are dismissed with the exception of item " one " of the " fourth " objection, which relates

to a bank deposit of $19,403.99, which sum was held on deposit by the testatrix in the Manufacturers Trust Company.

The objectant is the daughter of the decedent by a former husband who had died. Afterward, the decedent married Timothy H. Kelley.

On June 13, 1929, the decedent had a deposit of $20,000 with the Thrift Department of the Manufacturers Trust Company of New York city. The decedent became an inmate of St. Elizabeth's Hospital in the borough of The Bronx, and died there on July 11, 1929.

The original deposit card shows as follows: " D-5603

" Name: Matilda Bosselman Kelley.
" Address: 76 Caryl Avenue, Yonkers, N. Y.
" Occupation: Housewife.          Father's Name: August Evers.
" Name of Employer          Mother's
or Business: Self.          Maiden Name: Adelaide Plours.

| | Date | Withdrawal | Deposit | Balance | Account No. Trans. |
|---|---|---|---|---|---|
| 1 | 5–16–28 | | 21,887 50 | 21,887 50 | |
| 2 | 7– 2–28 | | 72 95 | 21,960 45 | |
| 3 | 12–31–28 | | 439 20 | 22,399 65 | |
| 4 | 2–28–29 | 1,000 00 | | 21,399 65 | |
| 5 | 4–17–29 | 1,399 65 | | 20,000 00 | |
| 6 | 6–13–29 | 20,000 00 | | 0 00 | |

" Transferred to joint account   #6659
" Signature: Mathilda Bosselman Kelley.
" Birthplace: Germany.
" Date of birth: 3–18–70.          Date 5–16–28."

The face of the joint deposit card which brings Timothy H. Kelley into the picture is as follows: " D-6659

" Name: Mathilda Bosselman Kelley and /or Timothy H. Kelley
" Address: 399 So. Bury, Yonkers N. Y.
" Occupation: Real Estate Operator.  Father's Name: John Kelley.
" Mother's
Maiden Name: Isabel Kelley.

| | Date | Withdrawal | Deposit | Balance | Account No. Trans. |
|---|---|---|---|---|---|
| 1 | 6–13–29 | | 20,000 00 | 20,000 00 | |
| 2 | 6–13–29 | 1,000 00 | | 19,000 00 | |
| 3 | 6–29–29 | | 403 99 | 19,403 99 | |
| 4 | 7–10–29 | 19,403 99 | | 0 00 | |

" Signature: Timothy H. Kelley.   Either or Survivor
" Signature: Mathilda Bosselman Kelley.
" Birthplace: Geneva, N. Y.
" Date of Birth: August 29–67          Color: White."

This indicates that, on the day before the decedent's death, Timothy H. Kelley withdrew the entire balance of $19,403.99.

The testimony of the paying teller of the Manufacturers Trust Company tells the entire story with relation to the changing of the account. It is as follows:

" FRANK J. BLENDER being sworn testified as follows:

" By Mr. JACOBS: Q. Your position? A. Paying teller. Q. Of what institution? A. Manufacturers Trust Company. Q. Were you such in 1929? A. Yes. Q. Were you acquainted with Mrs. Mathilde Bosselman Kelley? A. Yes. Q. Did you on June 13, 1929, have in your branch of that institution an account with Mrs. Kelley? A. Yes. Q. What was the nature of that account? A. Thrift account. Q. Do you know how much money she had in that account at that time? A. I could not tell. Q. Can you tell by looking at the records? A. Yes. Q. Prior to your seeing her on June thirteenth? A. Twenty thousand dollars. Q. Now pursuant to a call you received did you go some place and see Mrs. Kelley? A. Yes. Q. What was the date you called? A. June thirteenth, 1929. Q. Did you see Mrs. Kelley? A. Yes. Q. Where was she? A. In Saint Elizabeth's Hospital. Q. Where? A. Bronx. Q. Who was present when you called on her? A. Mr. Kelley. Q. Mr. Timothy H. Kelley, her husband? A. Yes. By the Court: Q. Anybody else? A. No. By Mr. Jacobs: Q. So we have it Mrs. Kelley and Mr. Kelley and you were present at the time? A. Yes. Q. In the hospital? A. Yes. Q. Was Mrs. Kelley in bed? A. Yes. Q. Did you have a talk with her? A. Yes. Q. Will you tell what the conversation was? By the Court: Q. How did you come to go there? A. I believe Mr. Kelley — Mr. WALSH: Objected to unless he knows. Q. You received a telephone call? A. Yes. Q. Who from? A. Mr. Kelley telephoned to the manager at the time. Mr. WALSH: Objected to and move to strike out. Mr. WALSH: Q. The manager told you that? A. The manager told me to go and change the account. Q. You did not have telephone communication with the lady? A. No. By the Court: Q. Who told you to go there? A. The manager of the bank. Mr. JACOBS: Q. Pursuant to that instruction you went there and had a conversation? A. Yes. Q. Give us the conversation? A. I impressed upon Mrs. Kelley the way the new account was to be opened, either one to withdraw the money. By the Court: Q. When you called what did she say to you? A. She said she wanted the money transferred so her husband could sign because she would need some money, she would need money for hospital expenses, and she owned an apartment house in which she said there was some vacancies and they would

have to draw money from time to time and she did not know how long she would be in the hospital, and if they needed money, so Mr. Kelley could draw some money. Q. Is that just what she said? A. Yes. Q. Is that all she said? A. Personal conversation about the family. Q. I am asking you to relate all she said? A. She told me that she was very much disappointed in her daughter. Mr. BUCKLEY: Objected to. The Court: I will take it as it reflects on mentality. A. She had no use for her daughter and they would need money for doctor's bills at the hospital, and bills incurred in the apartment house, and that was the reason she wanted Mr. Kelley to withdraw it. Q. Did she say anything else? A. No. Q. What did you say to her? A. I told her the way, if she understood the way the account was to be opened, either one could draw all the money if they wanted to and she said she understood and I trust my husband. Q. What happened then? A. I had the new signature cards made out and they both signed them. That is the way the account was opened. Q. Where are the signature cards? A. In the bank. Q. Why didn't you bring them? A. The lawyer did not instruct me. Mr. BUCKLEY: I subpœnæd the Fifty-seventh Street branch to bring the records here. Q. Is that all she said? A. Yes. Q. Nothing more? A. No. Mr. JACOBS: May we offer in evidence the cards showing the state of the account? The Court: Yes, and send to me the signature cards. [Received and marked Exhibit 1, 2.] Q. On July 10, 1929, when that joint account stood in the name of Mr. and Mrs. Kelley how much was there on deposit in the account? A. $19,403.99. Q. How much is there on deposit in the account today? A. Nothing. Q. What happened to that? A. Mr. Kelley withdrew the money. Q. How much did he withdraw? A. $19,403.99. Q. After the withdrawal of that sum on July tenth the account was closed? A. Yes. By the Court: Q. The money in the account was paid to Timothy Kelley? A. Yes."

The legal question presented to the court is whether Timothy H. Kelley became the joint, and now surviving, owner of the proceeds of the deposit, or whether his name was added to the account only for the purpose of convenience in the withdrawal of funds for the decedent, in which event the fund would belong to the decedent's estate.

The form of the deposit indicates an intent to create a joint ownership with the right of survivorship and the presumption created by the force of the statute would apply, *if not rebutted.* (Banking Law, § 249, subd. 3.) Upon the death of one of the depositors, this presumption becomes conclusive in favor of the survivor in respect to any moneys *then left in the account.* It con-

tinues to be a mere presumption in respect to any moneys previously withdrawn. The moneys now in controversy were no longer in the account at the death of Mrs. Mathilde Bosselman Kelley. They had been taken out during her life. The door is open to competent evidence that the tenancy created at the opening of the account was in truth something different from the tenancy defined by the presumption. (*Marrow* v. *Moskowitz*, 255 N. Y. 219, 221.)

The testimony above recited was offered in an attempt to neutralize the presumption. The evidence states that which was said by the decedent at the time of the change of the deposit by the decedent in the presence of the witness and Timothy H. Kelley. (*Matter of Levinsky*, 145 Misc. 318.)

The presumption set up by the Banking Law reversed the common-law rule requiring a holding in the absence of other proof that a deposit made in the name of the depositor and another person " would be paid to either or survivor of them " and becomes " the property of such person as joint tenant." This presumption is not conclusive and may be overcome by proof that the depositor, when making the deposit, had no intention of creating a joint tenancy. The other presumption flowing from the Banking Law, that title passes to the survivor to moneys still on deposit in the account at the death of the depositor, is irrefutable by proof and is, therefore, a rule of substantive law. This presumption does not apply " in respect of any moneys withdrawn by either during life." (*Moskowitz* v. *Marrow*, 251 N. Y. 380, 397.) It applies only " in favor of the survivor in respect of any moneys then left in the account." (*Marrow* v. *Moskowitz, supra*, at p. 221; *Matter of Hill*, 145 Misc. 631.) The withdrawal of moneys from a joint account does not destroy joint tenancy, if one was created. It merely opens the door to competent evidence, if available, that no joint tenancy was originally created or intended. (*Matter of Porianda*, 256 N. Y. 423, 425, 426.)

The question of the intent of the depositor in opening or changing an account is a question of fact to be determined on all the evidence in the case. The intention of the decedent is the thing to be looked for. The most direct form of evidence as to the depositor's intent is her express statement to the witness Blender. (*Matter of Wilkins*, 131 Misc. 188, 196, 197.)

No presumption exists evidencing anything on the part of the testatrix to create a joint account. There is proof to the contrary. Only a right was created to draw upon the account for the convenience of the decedent in the payment of her hospital bills and the care of her real property. The evidence shows that the name

of the husband was added for convenience only and for no other purpose.

I reach the conclusion upon the evidence that the opening of the joint account was primarily for the convenience of the decedent. (*Matter of Darashinsky*, 145 Misc. 426, Surrogate FOLEY, Aug. 1932.) The decree may contain a specific provision directing delivery by Timothy H. Kelley to the decedent's executors of the said sum of $19,403.99, with interest thereon at four per cent from July 10, 1929. In the event that such sum of money is not repaid by Timothy H. Kelley, the same may be used as a setoff against the sum of $25,000 which is now on deposit in the Yonkers National Bank and Trust Company, account No. 18156, deposited in accordance with the compromise agreement between Timothy H. Kelley and Adelaide E. Frees, dated December 26, 1929, and referred to in Schedule " H " of the account of proceedings herewith.

The sum of $19,403.99, with accrued interest, will pass into the hands of the decedent's executors for administrative purposes, and for which the said executors will file a supplemental account.