354 P.2d 97

**FIRST SECURITY BANK OF UTAH, N. A., a corporation, as Executor of the Estate of James C. Demiris, Deceased, Plaintiff and Appellant,**

v.

**Iphegenea P. DEMIRIS, Defendant and Respondent,**

**Margareta Demiris Papacastas et al., Intervenors and Respondents.**

No. 8982.

Supreme Court of Utah.

July 7, 1960.

------

Nathan J. Fullmer, Salt Lake City, for appellant.

George K. Fadel, Bountiful, Thornley K. Swan, Salt Lake City, Ray, Quinney & Nebeker, Salt Lake City, for respondent.

David K. Watkiss, D. F. Wilkins, Salt Lake City, for intervenors and respondents.

CROCKETT, Chief Justice.

James C. Demiris died testate on January 23, 1957, and left surviving him his wife, Iphegenea P. Demiris, and four brothers and a sister. He left no issue surviving him. At the time of his death he was 74 years of age and had been committed to the hospital for acute senile dementia some 33 days prior to his death.

During his lifetime he had accumulated an estate consisting of some $73,000 in bank accounts, $9,700 in United States savings bonds, and an interest in a note in the amount of approximately $16,000.

Certain of the bank accounts had been in joint tenancy with his wife for some considerable period of time while other of the accounts had been in his private bank account and were transferred over into joint tenancy with his wife on December 5, 1956. The bonds were held in joint tenancy, and the note was in his own name.

Just before Mr. Demiris' death, between December 21, 1956, and January 23, 1957, his wife withdrew all of the funds above mentioned, cashed the United States savings bonds, and deposited all of these funds in her own separate account. The intervenor brothers and sister contend that James Demiris was not mentally competent to deal with his funds on December 5, 1956; that he was under undue influence of his wife; and that the attempted transfer of $38,404.15 from his personal account to a purported joint tenancy account did not give her ownership of that fund.

The decedent and his wife had been married for about 31 years, and during which she resided separate and apart from him for some 13 years. It seems that she had a greater love for their native country, Greece, than did her husband, and the separations were while she was making visits to Greece. A number of years were spent by her in Greece due to the outbreak of World War II, when she could not return to the United States. There is much evidence tending to show that defendant and her husband did not get along together. The husband drew several wills, the last of which was admitted to probate, wherein he left each of his brothers and sister a legacy in the amount of $10,000.

Upon the trial the court refused to find in accordance with the plaintiff's contention that on December 5, 1956, James C. Demiris was incompetent or acting under undue influence. It concluded that the withdrawals from the joint bank accounts and the cashing of savings bonds by the defendant and depositing the moneys to her own account did not destroy the joint tenancies, and that she took them as the survivor.

It is to be recognized that in reviewing the findings of fact we should indulge considerable latitude to the findings of the trial court and not disturb them unless the evidence clearly preponderates to the contrary.[1] However, it is our prerogative and duty under the Constitution to review the evidence in equity cases and to modify or make new findings if the record compels it.[2]

In regard to the $38,404.45 account which was changed from the decedent's name to a joint account with the defendant on December 5, 1956, we do not say that the evidence so preponderates against the trial court's refusal to find that the decedent was incompetent or a victim of undue influence that the finding should be reversed. But there is another question to consider: in view of the circumstances disclosed by the evidence as to the creation of the account, and the fact that the defendant withdrew the money for her own purposes prior to the decedent's death, where was the ownership of that money?

In that connection it should be stated that we are not here disagreeing with the ruling in the case of Holt v. Bayles,[3] but it is significantly different from this case. It dealt with money remaining in a joint account after the death of one of the parties. The presumption was applied that such money passed to the surviving joint tenant, which seems sound in view of the necessity of some certainty in dealing with such accounts. It is to be recognized that the bank or other depository is normally protected in permitting withdrawal by either signator. But as between the parties themselves, the situation may be different.

We are in accord with the doctrine that when the wife withdrew all of the funds from the account in the lifetime of her husband, obviously for the purpose of getting possession for herself, with the intention of wrongfully depriving him of his rights therein, her action was inimical to the relationship that exists between joint tenants and this act violative of the relationship rendered the question as to the true owner-

1. In re Crandall's Estate, 1959, 9 Utah 2d 161, 340 P.2d 760.
2. Utah Constitution, Art. VIII, Sec. 9 (1896); Nokes v. Continental Mining & Milling Co., 1957, 6 Utah 2d 177, 308 P.2d 954.
3. 1934, 85 Utah 364, 39 P.2d 715.

ship open to determination. Such a rule, which we believe to be sound and to comport with fundamental principles of equity and justice, was applied by the surrogate court of New York in the case of In re Kelley's Will.[4] The decedent had maintained a bank account in her own name in which she had $20,000. On June 13, 1929, the funds were withdrawn and redeposited in the names of herself and her husband for the credit of, "either or survivor." A month later, July 10, 1929, the husband withdrew the entire amount and deposited it in an account of his own. She died the next day. The court stated that under those circumstances the following rule should be applied:

> "The withdrawal of moneys from a joint account does not destroy a joint tenancy, if one was created. It merely opens the door to competent evidence, if available, that no joint tenancy was originally created or intended."

and concluded that it was manifest that the joint account had been opened for the convenience of the decedent and held that the fund belonged to her estate.

The above rule and the reason supporting it are applicable to the instant case. Looking at the matter through the eyes of equity it seems indisputable that defendant's act of grabbing the money at the earliest opportunity was for the purpose of getting it for herself and excluding the cotenant therefrom; and that this was a wrongful act which should not be rewarded. Under such circumstances the court should look beyond the superficiality of the form in which the money was held and determine the true facts as to its ownership.

The evidence points unerringly to the fact that insofar as the purpose, desire, and intent of the decedent was concerned, the transfer of December 5, 1956, was for his convenience in the face of the exigency that he had to go to the hospital. Except for the bare fact that a joint tenancy account was opened there is no circumstance in this case which suggests any intent on his part to make a gift or a transfer of ownership of this fund to his wife. On the contrary, their marital history and attitudes, as disclosed by the record, would negative any such intent. Her own testimony to the effect that his purpose in putting the account in her name was because he was going to the hospital, coupled with her subsequent conduct of grasping the fund practically as soon as she could get her hands on it argue persuasively that he had no intent to endow her with the money, and that she fully realized that fact. We

4. 1933, 146 Misc. 353, 263 N.Y.S. 661, 667; see also Steinmetz v. Steinmetz, 130 N.J.Eq. 176, 21 A.2d 743, where the New Jersey court held that wrongful invasion destroyed a joint tenancy and in that instance regarded the status as being converted to that of tenancy in common.

think that the only reasonable conclusion to be drawn from the facts shown is that the ownership of the $38,404.45 remained in James P. Demiris and belongs to his estate.

■ In regard to the other bank accounts and the war bonds, the record indicates that they had existed in joint tenancy for various, but considerable, lengths of time prior to the transaction discussed above. The circumstance with respect to them was sufficiently different that the determination of the trial court that they were held in joint tenancy with the rights of survivorship and that these funds passed to the defendant by operation of law finds support in the evidence.

The $38,404.45 bank account is directed to be included in the estate of James P. Demiris, and in all other respects the judgment of the trial court is affirmed. Costs to appellants.

WADE and McDONOUGH, JJ., concur.

HENRIOD, Justice (concurring in part and dissenting in part).

I concur in result as to the $38,404.45 item. This was money previously in decedent's sole account which defendant induced him to put in a joint account just prior to his death, during a period when the decedent was suffering from acute senile dementia. I am convinced that undue influence clearly was exercised upon a dying man, too tired, sick or mentally afflicted to fight back. Under accepted rules of appellate review we should make such a finding and determine this case on the ground of an exercise of such undue influence. I am of that opinion particularly since Mr. Demiris did not change his will during this period shortly prior to his death, and also because of the fact that when he was under no mental illness whatever, and after defendant had induced him to change his will substantially reducing bequests to blood relatives to the distinct advantage of defendant, decedent on the very next morning secretly prepared and executed another will which restored such omitted bequests.

As to the joint accounts and the joint defense bonds that had been in existence for many years, I am in agreement with the main opinion's determination, since there is no evidence of undue influence in their creation, and none of tortious withdrawal.

I suggest that Mr. Chief Justice Crockett's opinion contains several fallacies and inconsistencies in its attempt to support sole ownership of the $38,404.45 in the deceased, which amount I consider to have been wheedled out of an ailing senile man.

1. The main opinion concludes that "we do not say that the evidence so preponderates against the trial court's refusal to find that the decedent was incompetent or a vic-

tim of undue influence that the finding should be reversed." It then rejects the trial court's obvious conclusion that Mrs. Demiris did not withdraw the money wrongfully. It now volunteers for the purpose of this case that "it seems indisputable that defendant's act of grabbing the money * * * was a wrongful act that should not be rewarded." The preponderance of the evidence is no more evident in the one conclusion than in the other, and for this court now to accept the trial court's determination that there was no undue influence in the deposit but to conclude that there was a wrongful withdrawal a few days later is an unexplainable, unwarranted inconsistency. Furthermore, it makes meaningless and but a devotional lip service to say elsewhere in the opinion that "in reviewing the findings of fact we should indulge considerable latitude to the findings of the trial court and *not disturb them unless the evidence clearly preponderates to the contrary.*" Why do it one place and not the other?

2. The main opinion attempts to distinguish Holt v. Bayles, cited therein, from the instant case on the ground that where the money is drawn out by one joint tenant after the death of the other there is a presumption that may produce an entirely different result. If the money is withdrawn five minutes after instead of five minutes before such death, the presumption operates. It says that there is a "presumption * * * that such money passed to the surviving joint tenant." It justifies such presumption upon the "necessity of some certainty in dealing with such accounts." There would seem to be just as much necessity for certainty in dealing with estates whether the money is withdrawn before or after death. And the surrogate court case cited in the main opinion is not dispositive here since it has to do with a statutory presumption and stands only for the proposition that absent such statute withdrawal from a joint account permits introduction of proof that no joint account ever was created. It simply said that the statutory presumption created by the Banking Law vests an existing joint account conclusively in the survivor, but that it did not apply to the situation where the withdrawal was effected before the death of one of the joint depositors. Aside from the statutory presumption created in the one situation and not the other, it is difficult for this writer to follow the reasoning of the main opinion that it is necessary to have a presumption to create certainty in dealing with the estates in the one situation, but not the other.

3. The basis for the decision, that the deposit was made "for his convenience in the face of the exigency that he had to go to the hospital" and thus was not intended to be a joint tenancy, flies in the teeth of reality and the practicalities of this case. At the time of the deposit, the decedent and his wife had $43,000 in joint, liquid,

cashable and withdrawable funds, including a $9,000 war bond. It is hardly likely and quite unbelievable to me that another $38,000 would be needed to take care of the exigencies of Demiris' attendance at a hospital which proved to be the scene of his last illness.

The case should be decided on the ground Mrs. Demiris exercised undue influence on Mr. Demiris, and that as a consequence thereof the $38,000 was a part of his estate irrespective of whether she drew it out before or after his death, and irrespective of any rightful or wrongful intent on Mrs. Demiris' part.

ELLETT, District Judge (dissenting).

I dissent. I am of the opinion that the law stated in the case of In re Kelley's Will cited in the main opinion is not the proper basis for taking the money from the widow and placing it in the estate of her deceased husband. The law as set forth in the case of Steinmetz v. Steinmetz, 130 N.J.Eq. 176, 21 A.2d 743, 745, more nearly sets forth what the law ought to be in Utah.

In that case the husband and wife during their joint lives deposited money in a joint bank account. While the husband was insane, the wife withdrew all of the money and placed it in another account in her own name. The court used the following language:

"* * * But the wife took advantage of her husband's disability and seized the entire joint funds in an inequitable attempt to deprive him of all interest and rights therein. Had he then not been under disability and had he brought suit against his wife for accounting for his share of their joint funds, there can be no doubt that on the facts as disclosed in this case he would have been adjudged to have an interest in the joint funds. * * *

"In the case of joint tenancy in personal property four unities must continue to exist, viz: Unity of interest, title, time and possession. Either joint owner may destroy one or more of the constituent unities in such manner as to sever his interest from the joint fund and so destroy its existence, thereby ending his right of survivorship. * * * By Mrs. Steinmetz's act she severed the unity of interest and possession which had theretofore existed between her husband and herself and she thereby destroyed the joint tenancy so far as her interest was concerned, including her right to have the joint funds as survivor. The joint accounts no longer existed and she made herself a tenant in common of the joint funds to the extent of her one-half interest therein and she held the half share of her co-tenant as agent or trustee for him."

The law ought to be to the effect that when one of two joint tenants, during the lifetime of the other, withdraws all of the funds in an attempt to gain the exclusive possession of the same and to deprive the other joint tenant of all rights therein, he destroys the joint tenancy relationship theretofore existing and takes the fund one-half as his own and one-half in trust for the other joint tenant.

Our own court in the case of Tracy-Collins Trust Company v. Goeltz, 5 Utah 2d 350, 301 P.2d 1086, held that when a husband placed a mortgage upon real property held in joint tenancy, he severed and terminated the joint tenancy estate theretofore existing between the parties and converted the holding into a tenancy-in-common relationship. That holding opens the door for this court to follow the Steinmetz case, and I would be in favor of doing that in this appeal.

There are cases which hold that the withdrawal of all the funds of a joint account by a joint tenant does not terminate the joint tenancy relationship, but most of those cases deal with the situation where the wrongdoer, that is, the one who withdraws all of the funds, dies first, and the survivor has been permitted to take all of the funds. The case of State v. Gralewski's Estate, an Oregon case reported in 176 Or. 448, 159 P.2d 211, 161 A.L.R. 66, and the cases therein cited are authority for this proposition. However, those cases differ from this matter wherein the survivor is the one who attempted to take and claim all of the money.

The defendant in this case cashed $9,700 worth of United States savings bonds which were held in joint tenancy between herself and her deceased husband. She contends that she is entitled to all of the $9,700 by reason of Treasury regulations of the United States Government. It is contended that these regulations have the force and effect of law and that the savings bonds are contracts between the United States Government and the co-owners named therein and that the surviving co-owner is the absolute owner of the funds and that during the lifetime of the co-owners either party may cash the bonds and hold the funds as the absolute owner.

Some states have so held, and some states have passed statutes providing that the laws of descent and distribution do not apply to such funds. However, the Treasury rules were meant to give the Government immunity in paying the bonds to either one of the joint owners, and it is a state matter to determine between the parties thereto whether or not one of them would hold funds in trust for the other. Under the facts of this case the Treasury regulations are of no importance except to discharge the United States Government in its contractual liabilities in connection with the bonds. The $9,700 obtained by

the defendant from the cashing of the bonds should be held fifty per cent for the defendant and fifty per cent in trust for the executor of the estate of the decedent.

I particularly dissent from the proposition often stated by this court that there not only is a right to make findings of fact in an equity case but that this court has a duty to do so. I could concur in the statement if the case was tried as old equity cases always were tried, namely, upon depositions and affidavits, because in such cases this court would be in equally as good a position to determine the credibility of the witnesses as was the trial court who read the documents. I cannot believe that this court is in any better position to make findings of fact in an equity cause tried on oral testimony than it would be in a law case where the issues of fact are determined by the jury.

Article VIII, Section 9, of the Utah Constitution provides as follows:

"From all final judgments of the district courts, there shall be a right of appeal to the Supreme Court. The appeal shall be upon the record made in the court below and under such regulations as may be provided by law. In equity cases the appeal may be on questions of both law and fact; in cases at law the appeal shall be on questions of law alone. * * *"

Nothing is said about making findings, and a reading of the proceedings in the constitutional convention when this section was under consideration will show that no such power was ever intended to be conferred upon this court.

Fear was expressed by some of the members of the constitutional convention that the article as ultimately passed would give to the Supreme Court the right to try cases anew. In Volume II of the proceedings of the constitutional convention at pages 1511 and 1512 Mr. Evans of Weber County made the following statement:

"The record may show the strongest kind of a case in favor of a client, when you read it coldly as written out, and yet a judge sitting upon the bench might read right in the face of that witness a lie in every word and sentence that he utters; and you would permit the supreme court, would you, to pass on that question, when it is without the necessary and essential means of determining the truth or falsity of the testimony? And another thing, if this principle be adopted, that an equity case can be reviewed upon a conflict in the evidence, then take for illustration one of those classes of cases which are familiar to you all. Take a water case among the farmers. One set of witnesses will swear that a certain quantity of water was appropriated at a certain time by a certain person. Another set of witnesses will swear that the appropriation was made

prior to that time by the other party. There will be a direct conflict in the evidence. The trial judge in many cases goes out and examines the water ditches; he looks at the quantity of water flowing; he examines the premises. This is frequently the case in equity cases, not only in water cases, but also in mining cases. He goes down into the shaft, through drifts and stopes and levels, and examines everything to ascertain whether or no the witnesses have told the truth. Now, gentlemen, if this cold fact can be reviewed by the supreme court, the supreme court would not be likely to do these things. It would not examine the witnesses, it would not see their deportment, probably would not examine the premises, or go into the mines and make an examination to ascertain what the fact is, but would take a conflict of evidence before it, and have the right to determine which set of witnesses told the truth and which swore falsely. I do affirm, that no such system of jurisprudence was ever inaugurated in any civilized government, English or American.

"The rule is this, that the chancellor hears all the evidence; from that evidence he makes a finding of fact, which finding of fact may be reviewed by the supreme court, or all the evidence might be taken up with the finding of fact for the purpose of ascertaining whether the chancellor came to the correct conclusion or found the proper facts. *And if the evidence shows that he did not find the proper facts, or if the facts do not justify the conclusion, then the supreme court, as a matter of law, reverses the chancellor and his case is retried, but not tried by the supreme court. It is returned to the chancellor again for a retrial where the witnesses can again be summoned and brought into court and examined as they were originally.* But this system would simply overturn every foundation principle of American jurisprudence, to permit a supreme court, sitting away from the people and away from the witnesses, to determine what their motives and their promptings were at the time they gave their evidence." (Emphasis added.)

On pages 1512 and 1513 of the volume above quoted Mr. Thurman had this to say:

"In equity cases, it may be upon both questions of the law and fact. In cases at law it shall be upon questions of law alone. Now, there is an appeal allowed to-day for insufficiency of the evidence, whereby the supreme court can even review the facts passed upon by a jury, and in some cases say that the jury found wrongly. There they passed upon the facts, and I take it that that is what this means, that we

do not want to permit the supreme court to pass upon even the sufficiency of the evidence. Because for the trial judge to say to a jury that they shall be the sole judges of the facts and the sufficiency of the evidence and the weight of it, and after they have decided it under those instructions, to have some other man or set of men review that and say that the jury decided wrong, is not to leave the facts with the jury, and for that reason we want it understood here that in cases at law where a jury passes upon the facts, there should be no review of the facts by the supreme court; but in cases of equity that it might continue just as it is to-day under existing law. Now, I will be frank, it may be my ignorance—if that means anything more than it does to-day, that the court may review the facts for the purpose of determining the sufficiency of the evidence, then I agree with the gentleman and am not in favor of it, but I take it that that is all it means."

At page 1507 of the volume above quoted Mr. Varian stated to the convention what the general rule in regard to equity causes was at that time:

"The general rule in regard to equity causes is that the evidence is taken by what we call depositions; that is, it is taken down in writing; witnesses are never called in equity cases, except in accordance with the code statute, and this means appellate jurisdiction. Whatever may be in the record of the court below would be taken to the court above."

The three gentlemen above quoted were lawyers and were relied upon by the members of the constitutional convention in explaining these matters.

It has become the practice in the courts now to try equity causes upon oral testimony the same as law cases are tried. This is a natural outgrowth of the administration of the two systems of jurisprudence in the same court and in the same case when required.

I am opposed to this court's becoming a trier of the facts. It should confine its efforts to a review of the alleged errors of law and to a passing upon facts in equity cases only when it is in the same position as is the district court judge, viz., when the facts are established by documentary evidence only. This court should put emphasis upon a determination of what the law is or ought to be and leave factual situations based upon oral testimony to be determined by the trial judge in causes in equity the same as in law actions.

I would require each party to bear its own costs in connection with this appeal, and would remand the case with directions to the trial judge to determine if the taking possession by the wife was done with the

intent, wrongfully, to deprive the husband of his rights in the joint property, and if it was so found, then to award one-half thereof to her and one-half to the Executor of the estate of her deceased husband; and unless ·the taking was wrongful, then I would affirm the judgment.

CALLISTER, J., having disqualified himself, does not participate herein.