484 P.2d 1188

**BEEHIVE STATE BANK, a corporation, Plaintiff and Respondent,**

v.

**Deon ROSQUIST et al., Defendants,**

**First Security Bank of Utah, N. A., a corporation, Garnishee,**

**Fred L. Painter, Intervener and Appellant.**

No. 11951.

Supreme Court of Utah.

April 14, 1971.

Will L. Hoyt, Nephi, for intervener and appellant.

Robert M. Anderson, Roger H. Thompson, of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for plaintiff-respondent.

L. Ridd Larson, of Ray, Quinney & Nebeker, Salt Lake City, for garnishee.

TUCKETT, Justice.

This is the second appeal in this case. The first appeal in this matter was by the plaintiff from a summary judgment entered by the court below in favor of the intervener. After remand and a trial in the court below, judgment was entered in favor of the plaintiff and against the intervener, and the intervener now appeals to this court.

The plaintiff, Beehive State Bank, was a judgment creditor of Ila R. Painter and

during her lifetime caused a writ of garnishment to issue, attaching a joint checking account standing in the name of Ila R. Painter and Fred L. Painter, her husband. During the pendency of these proceedings Ila R. Painter died. The contract entered into by the defendant Ila R. Painter and her husband, Fred L. Painter, intervener, at the time the joint account was established contained the following provisions:

The joint depositors whose names are signed on the reverse side of this card hereby agree with each other and with the above bank that all sums now on deposit, heretofore or hereafter deposited by any one or more of said joint depositors with said bank to their credit as joint depositors, with all accumulations thereon, are and shall be owned by them jointly with the right of survivorship, and be subject to the check if the account is a checking account or receipt if the account is a savings account of any one or more of them or of the survivors or survivor of them, and the payment to or on the check or receipt of any one or more of them or the survivor shall be valid and discharge said bank from liability.

On the first appeal the court was of the opinion that the matter could not be decided by a summary judgment based upon the affidavit of the intervener alone. The case was remanded to the trial court for the purpose of determining the interest of Ila R. Painter in and to the fund while she was alive, if any she had, which should be applied toward satisfaction of the plaintiff's judgment.[1] A trial was had in the court below during the course of which the bank's signature card with the agreement thereon above referred to was introduced in evidence, as well as the deposit slip showing two deposits to the account which were the only ones made.

It may well be that the trial court misinterpreted our decision when this case was first remanded for trial. In that decision we said if the contract between the parties ostensibly creates joint tenancy relationship with full right of survivorship, there arises a presumption that such is the case unless and until some interested party shows under equitable rules that the contract should be reformed to show some other agreement of the parties or that the contract is not enforceable because of fraud, mistake, incapacity, or other infirmity.[2]

This matter is remanded for a further hearing as to the ownership, if any, of Ila R. Painter in the account either by

1. Beehive State Bank v. Rosquist, 21 Utah 2d 17, 439 P.2d 468.

2. Neill v. Royce, 101 Utah 181, 120 P.2d 327; Braegger v. Loveland, 12 Utah 2d 385, 367 P.2d 177; Kennedy v. Kennedy, 169 Cal. 287, 146 P. 647.

gift or the deposit of her separate funds, and also on the issue of the unenforceability of the deposit contract.* The parties should have the opportunity of producing any further evidence they may have. No costs awarded.

CROCKETT, J., concurs.

CALLISTER, Chief Justice (concurring).

I concur but wish to direct attention to the recent decision of this court in Hobbs v. Fenton, 25 Utah 2d 206, 479 P.2d 472 (1971).

HENRIOD, Justice (dissenting in part and concurring in part).

The observations of this author well might be labeled an Anatomy of Near Murder of a Utah Joint Account. It all started after Holt v. Bayles,[1] which involved a joint bank account created about 36 years ago by Anna and Emma Bayles. About $13,000 of Anna's money was deposited in a local bank under a written agreement [2] to the effect that it was owned jointly with right of survivorship, and with right of withdrawal by either. Anna died and Emma, as survivor, withdrew the money. She admitted she contributed nothing to the fund. When asked "When were you to have the money?" she frankly answered "When aunt Anna died." In an action by nieces against Anna's executrix, to have the money declared that of the estate, a nonsuit was entered and we affirmed, saying the decision "was controlled largely by the *agreement* of joint tenancy executed by Anna and Emma Bayles." The plaintiffs had not alleged any fraud, overreaching, mistake, incompetency or failure of the agreement to express the true intent of the *parties,* or that it was ambiguous or uncertain,—the whole argument being that Anna owned all the money and "that the deposit card agreement does not make a binding contract of survivorship or create a joint tenancy." The trial court rejected such argument. We unanimously agreed, saying that under the above circumstances "the question of intention ceases to be an issue and the courts are bound by the agreement."

The law of Holt v. Bayles [3] was eminently clear and for years became the guideline for all attorneys, who advised their clients that they might eliminate expenses and lengthy probate proceedings by creating joint bank accounts with a right of survivorship.

---

* Union Properties v. Cleveland Trust Co., 152 Ohio St. 430, 89 N.E.2d 638.

1. 85 Utah 364, 39 P.2d 715 (1934).

2. "The undersigned joint Depositors hereby agree" each with the other "that the money deposited" shall be owned by them jointly, with right of survivorship subject to receipt by either or the survivor.

3. Decided December 28, 1934, written by the Hon. William H. Folland.

Almost exactly seven years later, this court whose membership included only one that had sat in Holt v. Bayles, decided Neill v. Royce,[4] which was the very first case involving a joint bank account since Holt v. Bayles, and in doing so, initiated the dissection of the latter's decision. Florence, the plaintiff, had been married to Royce and bore him several children. They were divorced, and Royce married another woman named Ida, who had several children by a previous marriage. Ida had a sum of money which she put in a joint account with Royce, ostensibly to save her own children from the expense of probate if she died. Royce said he would not claim any of the money. Royce became delinquent in support payments for his children by Florence, who attached the joint account out of which the trial court gave her an award, after Ida claimed sole ownership of the account. The trial court relied on the contract and its terms and decided the case on the precedent of Holt v. Bayles. This court on appeal, actually *affirmed* the trial court, but in doing so based its affirmance on considerable double-talk about a presumption of ownership. This was a theory urged by no one save this court's judicial altruism. The court held that the clear unambiguous terms of the agreement were subject to two presumptions,—that ownership is presumed to be in joint tenancy if both of the depositors *are alive,*—which can be overcome by clear and convincing evidence,—*but if one of them has died,* the presumption of total ownership is *conclusive* in the survivor. No reason was stated for the difference, which provokes antithetical results arising from identical language found in a clear, unambiguous instrument where the intentions are clearly expressed. No reason is given why a joint tenancy presumption should exist five minutes *before* a death, which can be defeated by clear and convincing evidence (whatever that means in interpreting an instrument incapable of having more than one clearly expressed meaning), while a *conclusive* presumption should exist five minutes *after* the death, which then becomes impervious to attack by clear and convincing evidence or any other kind of evidence, save, perhaps, that of fraud, overreaching, etc. mentioned in Holt v. Bayles,—none of which was urged by anyone in the Neill case. Thus it would appear that Neill v. Royce is an illegitimate offspring of legal reasoning, contractual construction, pleading and theories urged. At this juncture it is obvious that the court affirmed half of Holt v. Bayles and overruled half. At this juncture it also obviously departed from the elementary principle that when parties reduce to writing their intentions, absent any equitable basis for reforming clear, understandable language, they, and particu-

4. 101 Utah 181, 120 P.2d 327 (Dec. 29, 1941).

larly strangers to the instrument, are bound by its terms, not vulnerable to any kind of attack by parol. Why this court in Neill v. Royce opined that the principle enunciated in Holt v. Bayles applied only in survivorship cases is as mysterious as Marley's ghost, since it was unequivocally stated in Holt v. Bayles, without any hint of the distinction made in Neill v. Royce, that "Where there is a joint agreement executed by the parties which clearly declares the intention to create a joint interest of each in the deposit, or credit, the court will sustain such intention thus expressed, especially where the contract is not attacked for fraud, mistake, incapacity, or other infirmity," and that "Where such intention is clearly expressed in a written contract executed by the parties, which remained unaltered, and there is no fraud, undue influence, mistake, or other infirmity alleged, *the question of intention ceases to be an issue* and the courts are bound by the agreement."

Without any apparent or expressed good reason, Neill v. Royce cut the juris out from under the corpus of Holt v. Bayles— and became the Utah law in the Utah joint account area.

Eight years after Neill v. Royce, in Greener v. Greener,[5] with no intervening Utah joint account cases having been decided, we arrived at an opposite conclu-

sion, based, however, on the reasoning in Neill v. Royce, where we said that the joint account was immune from attack on the ground that either one or the other of the joint depositors owned all or part of it, because there was no clear and convincing evidence of intention to sever the presumptively true, valid joint account or to reform the perfectly clear joint account agreement. In Greener v. Greener we affirmed the lower court's decision that the joint account was *not* a true, valid joint account because the clear and convincing evidence showed that there was no intention whatever to make Greener's wife a joint tenant, although both of them signed an agreement that in clear, indisputable language said that that *was* their intention.

The labor pains of Greener v. Greener almost reflect an apologia for Neill v. Royce. A copious use of triticisms like "This is an equity case," "The trial judge had the witnesses before him," and "He could note their demeanor on the stand, judge their ability to register and retain impressions and to transmit them intelligently and to their candor or lack of it," "In that stage where the court draws conclusions from the basic facts previously found by him, we are on a more equal plane with him," and others ad infinitum, may have served to obfuscate rule and reason, but they cannot escape the fact that this court, on admittedly contradictory evi-

5. 116 Utah 571, 212 P.2d 194 (1949).

dence, says *contradictory evidence alone* may be the basis for reforming a crystal clear document, by the simple device of saying that on contradictory evidence this court can, without contradiction, change the terms of an instrument that is worded such as to preclude any lexical contradiction or ambiguity whatever. Greener simply was a case where an old man, 80, married a young woman, 65, created a joint bank account, but because of his impotency, timidly alleged by Mrs. Greener in a divorce action, created a generation gap that prompted him to withdraw the money and give it to his more lovable son, while she, Mrs. Greener, on a lark of her own, was on a trip to California.

Nonetheless, Neill v. Royce persisted through the Fabulous Fifties, when, in July, 1960, ten years after Greener v. Greener and nineteen after Neill v. Royce, we decided First Sec. Bk. v. Demiris,[6] without any intervening joint account cases having been decided. In the latter case we initiated a series of ever accelerating cases attended by judicial autopsic diagnoses almost leading to the demise, but not total interment of the now emaciated Joint Account.

In that case Demiris and his wife Iphegenia, married some 31 years, had several joint accounts and bonds over a considerable period. He had a separate $38,000 account which he converted into a joint bank account with Iphegenia while he was in the hospital, ill and allegedly senile. He died a short time later. His brothers and a sister claimed the money belonged to the estate, because of Demiris' incompetency and his wife's undue influence. The trial court found there was no incompetency and no undue influence. The case should have ended there, since Holt v. Bayles, and Neill v. Royce and Greener v. Greener, the only precedents existing at that time, *all* held that where there was a survivor of a joint account, it belonged to the survivor,—in this case Iphegenia,—lacking any equitable grounds such as *fraud, undue influence,* etc. or other equitable infirmity shown by clear and convincing evidence justifying reformation of a clear, unambiguous agreement, in all respects valid and enforceable by its terms or by rebuttable presumption not destroyed by clear and convincing evidence. There *was* no undue influence shown in this case, although alleged, nor was there any other equitable infirmity either alleged, proved or hinted, nor was there any evidence having to do with the Neill v. Royce presumption. Until this case came along, the three precedents mentioned above were decided by a unanimous court. In the Demiris case, the split came on a 3-to-2 count,—and well it might. The main opinion conceded that the case could not be

6. 10 Utah 2d 405, 354 P.2d 97 (1960).

reversed on grounds of incompetency or undue influence. It inconsistently said it did not disagree with Holt v. Bayles,— which in fact it obviously did. It then chopped off another leg of the torso in the saga of the joint account's demise, by saying there was another question to consider: Who owned the money? The agreement itself said Iphegenia owned the money, Holt v. Bayles said she owned the money, Neill v. Royce said she owned the money, Greener v. Greener said she owned the money, and the trial court said she owned the money. In this split decision, our court said she did *not* own the money, by indulging a disarming and erratic syllogism, i. e., that she withdrew the funds for the purpose of getting possession herself (which all surviving joint tenants do), with the *intention* of *wrongfully* depriving Demiris of his rights therein (which is a gratuity not in the record, and truly negated by the findings of the trial court), which was inimical to the joint *tenancy relation* (which is not in any way explained from the contract, the cases or the findings and conclusions of the trial court). The opinion simply agrees with the findings of fact of the trial court, and without expressly overruling them, ignores them and chooses its own conjectured facts and arbitrarily overrules the law in Holt v. Bayles, Neill v. Royce, and Greener v. Greener. At this point the law in Utah became a philosophic, paternalistic

dreamboat to the effect that even if we have to agree that the trial court accurately found the facts, and even though it correctly applied the existing law, we reject the facts in favor of our own, and ignore the law, and emotionally destroy a clearly expressed, unambiguous instrument in favor of our own whimsy.

The above not only blew a $38,000 asset, it introduced several brand new principles into what was thought to be somewhat doctrinal in joint account situations: 1) It sanctioned an arbitrary finding of fact by this court of the *mutual intentions* of two signatories to a joint account on the testimony of only *one* of them,—Iphegenia, who was the only witness thereto,— the trial court finding no merit to the brother's and sister's claim of incompetency and undue influence, no claim having been made on any other than those two grounds; 2) It sanctioned an arbitrary finding of fact by this court of the *mutual intentions* of two signatories to a joint account, on no evidence at all, since the only evidence thereof was Iphegenia's testimony which was *uncontradicted* but disbelieved by a majority of this court, leaving nothing but an inference based on withdrawal of the money, which was inimical to the findings of the trial court that the majority here approved; and 3) It sanctions this court's approval of a complete violation and evasion of principles with respect to parol evidence, and in truth sanctions our free

and uninhibited espousal of deciding a case on conjecture, emotion, myopia, and illusory stare decisis.

A year and a half later we decided Braegger v. Loveland,[7] where one William Braegger, about two months before his death, opened a joint account with his money in his name and that of his sister, Emma Loveland. She withdrew the money about a month before William died. His administrator sued Mrs. Loveland asserting title thereto in his estate, relying on First Sec. Bk. v. Demiris, supra,—on facts with respect to creating the account and withdrawal therefrom almost identical thereto. The trial court gave one half to the administrator and one half to Mrs. Loveland. In this, the Braegger case, another 3–2 decision, this court again paid no attention to the trial court, but reversed it and decreed the entire amount to Mrs. Loveland, the appellant. The reasoning of the court was that Emma, unlike Iphegenia in the Demiris case, was not grasping, the withdrawal was not inimical to the joint account as in Demiris, but that William had an intent to and made a *gift* of the money to Emma,—quite foreign to the conclusion of the trial court and a stranger to any theory of either party. The court cited Neill v. Royce for its decision, which case held just the opposite and based its decision on presumptions, one of which was to the effect that irrespective of any intent, there was a *conclusive* presumption that the survivor of a joint account was entitled to the funds. The opinion cited Tangren v. Ingalls,[8] decided one day earlier, for the principle that the intentions of the parties should govern irrespective of the fact that one of the parties had died before the controversy, which flies in the teeth of Neill v. Royce, which the opinion cited,—obviously inaccurately,—since Neill v. Royce eliminated the question of intent and stated that intention was no factor where one of the parties is deceased, there being a conclusive presumption of ownership in the survivor. Tangren v. Ingalls, which was another 3–2 decision, compounds the confusion engendered in the Braegger case by an attempt to circumvent established principles pertaining to contracts and the parol evidence rule, suggesting that joint account agreements are really not agreements at all but only vehicles of convenience for some special purpose, and basically not an agreement between the depositors who are the signators, but with the bank that is not a signatory thereto but a beneficiary thereof, and that no one need bother about the words in the agreement, but simply the intentions of the signers, provable by showing the intention of only one of them,—the deceased one, without regard to any equitable reason whatever even being asserted

7. 12 Utah 2d 384, 367 P.2d 177 (1961).

8. 12 Utah 2d 388, 367 P.2d 179 (1961).

or alleged. That case just about provoked the last gasp of the joint account in Utah.

About four years later we decided Haywood v. Gill,[9] having to do with a joint bank account, which upheld the right of the surviving joint depositor, where it was shown to be an agreement based on consideration, without any question of equity, etc. so that it adds nothing authoritative to the instant case.

The Haywood case was followed by Culley v. Culley,[10] which turned out to be a carbon copy of Tangren v. Ingalls,[11] with hauntingly familiar language.

The next year we decided Hanks v. Hales,[12] the first unanimous decision of this court regarding the equitable aspects of joint accounts in 17 years when Greener v. Greener [13] was decided. The appellants' theory in part was that the four unities of title, interest, time and possession characteristic of joint tenancies at common law did not maintain in this case of joint account. This court pointed out that modern joint accounts are not proscribed by that concept. What is of significance in the case is that for the first time in 32 years [14] this court seemed to be clearing up the joint account confusion by almost repeating the principle of Holt v. Bayles by saying "This is an agreement between the bank and the parties, fixing the conditions upon which the money is deposited; upon which it may be withdrawn; *and the rights of the parties between themselves. Such a deposit card when duly signed is entitled to the same sanctity as any other duly executed written contract.*" This quoted language clearly departed from what was said in Tangren v. Ingalls to the effect that the deposit agreement is "basically an agreement with the bank * * * and its recitals need not necessarily be regarded primarily as an agreement between the parties, nor as reflecting the true relationship between them,"—which language was almost identically echoed in Culley v. Culley,[15] authored by Mr. Justice McDonough with a resonantly familiar ring. The Hanks decision, in almost reaffirming Holt v. Bayles, carefully avoided citation of any predecessor joint-account cases having to do with the "convenient contract" concept (Tangren v. Ingalls; Culley v. Culley), "who owns the money" idea (First Sec. Bk. v. Demiris), "presumptions in survivor or intervivos contests" (Neill v. Royce), "intention shown by clear and convincing evidence irrespective of the parol evidence rule or equities such as fraud, etc." (Greener v. Greener), "intention to make a gift"

9. 16 Utah 2d 299, 400 P.2d 16 (1965).

10. 17 Utah 2d 62, 404 P.2d 657 (1965).

11. 12 Utah 2d 388, 367 P.2d 179 (1961).

12. 17 Utah 2d 344, 411 P.2d 836 (1966).

13. 116 Utah 571, 212 P.2d 194 (1949).

14. Holt v. Bayles, 85 Utah 364, 39 P.2d 715 (1934).

15. 17 Utah 2d 62, 404 P.2d 657 (1965).

cases (Braegger v. Loveland), "facts showing inimicability to the joint account relationship itself irrespective of parol evidence rule or ordinary equity defenses such as fraud, etc." (First Sec. Bk. v. Demiris; Braegger v. Loveland), "the four unities of title, interest, time and possession, * * * of joint tenancies" principle (Hanks v. Hales). On the other hand, Hanks v. Hales cited copious authority in areas not involving joint accounts but having to do with equitable matters incident to real property. It simply treated the joint account agreement as any other written contract would be treated and without altering it except on some proper ground, and then by clear and convincing evidence. This case, as stated, was the first case in 17 years that ignored the application of a series of cases giving chameleonic reasons to modify the clear, unambiguous language of the joint account agreement, and to espouse the application of the general principles of law and equity to the effect that parties are free to enter into contracts of their choice, even though improvident, to whose terms, if clear and unambiguous, they are bound by the parol evidence rule, and which cannot be altered or modified except "for fraud, mistake, incapacity, or other infirmity," which was the rule in Holt v. Bayles. In saying this I do not think there is any "infirmity" in a contract based on "intention" of the parties, where in a clear, unambiguous contract, one says

it was *his* intention that *he* own the money, while the other says it was *his* intention that *he* own all the money,—which was the situation in practically all the cases since Holt v. Bayles which have woven a juridical coat of many colors in Utah joint account cases. I think the true rule should be that laid down in Hanks v. Hales, supra, supplemented and paraphrased as suggested in this paragraph.

The instant case was here before, Beehive State Bank v. Rosquist, 21 Utah 2d 17, 439 P.2d 468 (1968). It was sent back to take further evidence. I thought it could be disposed of on procedural grounds on the record. Mr. Justice Ellett, in his opinion, said substantially what I do here, in part, about Hanks v. Hales, but I think he did not go far enough in the rule he set forth and which was adopted by the court. The weakness in the rule is the first phrase, that "*If* the contract between the parties ostensibly creates a joint tenancy * * * there arises a *presumption* that such is the case unless * * *" It seems to me that "if" and "ostensibly" beg the question. There having been concededly a joint account contract created in clear, unmistakable language, it would seem that it would not be subject to an attack by parol, since the intentions, as here, clearly are stated, and there is no uncertainty or ambiguity to resolve. If the parties inter se wish to abandon their contract that is well and good and there is no need to invoke the office

of equity, but practically every joint account case we have examined has been a contest where one party or his representative claims the clear, unambiguous language was intended to mean one thing, while the other party or his representative says it was intended to mean the opposite, which gives the lie to an impossible conclusion that flies in the teeth of the clear, understandable language itself. The very purpose of the parol evidence rule is to strike down any such distortion of that clear, understandable language that we emotedly have indulged over the years. In spite of the clarity of the contract which is admitted to have existed in the case which is here again, and in spite of the parol evidence rule, this court sent it back to take evidence for the possible purpose of violating both the plain language of the contract and the plain objective of the parol evidence rule, which would seem to be a precedent for ignoring contracts, disposing of the rule, and making a contract for parties against which their chosen language obviously and clearly militates.

About two months after the first Beehive case, we had Continental Bk. v. Kimball [16] before us. This case had to do with a joint account in a commercial bank. We borrowed Ch. 17, Sec. 38, Laws of Utah 1961 (7-13-39, U.C.A.1953, as amended), Savings and Loan Act, to lay down the rule that the survivor of a joint savings account in a commercial bank was the owner thereof, and that such ownership was invulnerable to attack. This, by analogy to the building and loan association act. This decision and opinion were arbitrary but logical, and certainly deserve approval. That case in effect revived Neill v. Royce,[17] and half of Holt v. Bayles, but left wandering in the "shifting sands" of joint accounts (about which Mr. Justice Ellett spoke in the first Beehive case) the matter of rights of the parties inter se or where the contract is attacked by third persons such as creditors. The Continental Bank case is inconsistent, however, when it repeats the rule laid down in the first Beehive case by Mr. Justice Ellett, since that rule, it is noted, does not restrict itself to inter vivos, inter se or creditor-attacked joint account cases, but as worded, would apply to Continental Bk. v. Kimball, supra. I concurred in the Continental case because it took us back at least to Neill v. Royce and the conclusive presumption of ownership in the survivor. I take it that since the joint account was with a commercial bank and not a savings and loan association, and the fact that we applied the statutory rule applicable only to the latter, to a commercial savings bank, *there can be no logical reason why this court should not apply the same rule to any and every joint account*. Since Continental restricted its decision prospectively it would not be applicable in the instant case, since

16. 21 Utah 2d 152, 442 P.2d 472 (1968).

17. 101 Utah 181, 120 P.2d 327 (1941).

the joint account here had a 1964 date, and would be subject to the law at that time. Neither would Hanks v. Hales or Hobbs v. Fenton, a case discussed in the next paragraph, for the same reason.

Two and a half years after Continental Bk. v. Kimball, we decided Hobbs v. Fenton,[18] 1971. A joint account created by one Buhler with his daughter was attacked by other surviving children after his death. The thrust of the complaint was that the bank account was created *for the purpose of convenience.* No equitable ground to reform the joint account, such as fraud, undue influence, mistake or the like was alleged. We said:

"The bank account and stock certificates constituted valid, enforceable written contracts. There were two grounds upon which plaintiff could assert his claim: one, the contract was void because of fraud, mistake, incapacity, or other infirmity; or, second, he was entitled to the equitable remedy of reformation of a written instrument because such instrument failed through accident, mistake, or fraud, or a combination of fraud and mistake to express the real agreement *or intention* of the parties. *The latter case is premised on the theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake or mistake and fraud, some provision was omitted or mistakenly inserted, and the*

*action is to change the instrument* as *to* conform it to the contract upon which the parties had agreed."

and we further said, quoting from Continental Bank v. Kimball:

"Since the appellant is not trying to reform the contract and is not claiming fraud, mistake, incapacity, or other infirmity, we think that it is conclusively bound by the contract as made and cannot show that the parties intended a result contrary to that which the law of joint tenancy relationship imposes."

With this case, I think we have now gone almost full circle back to Holt v. Bayles, supra. The only difference might be said to be the fact that in Holt v. Bayles the court, after concluding that the joint account was immune from attack unless "fraud, mistake, incapacity or other infirmity" is shown, also said the question of intent in joint accounts ceases to be an issue. Reading the latter phrase in context with the former, it seems apparent that the court in Holt v. Bayles did not have in mind that intent was not an issue where *mistake* was shown. Hobbs v. Fenton, supra, clears up any conceivable inconsistent interpretation that might be advanced in reading Holt v. Bayles when one reads the quotation, supra, from Hobbs v. Fenton. I believe that Hobbs v. Fenton accurately

18. 25 Utah 206, 479 P.2d 472 (1971).

states the law under accepted principles ex contractu as limited by the parol evidence rule and the principle that people should be able to contract as they choose, and are bound by their clear, unambiguous commitments reflecting their intentions, enforceable by and against all those interested, save where there are equitable reasons such as enumerated in Holt v. Bayles, Hanks v. Hales, Hobbs v. Fenton that would render their enforcement unconscionable in the atmosphere of the Chancery.

Since Hanks v. Hales (1966), the case that practically revived Holt v. Bayles, was decided after the creation of the joint account in the instant case (1964), cannot control here because it was decided after the joint account involved in the instant case, nor can Continental Bk. v. Kimball (1968), nor Hobbs v. Fenton (1971), it follows that the cases of First Sec. Bk. v. Demiris, Braegger v. Loveland and Tangren v. Ingalls would prevail here, being the law at the time the joint account was created, they respectively being questions of 1) who owned the money? 2) was there a gift intended? or just plain 3) what was the intention of the parties?—all irrespective of fraud, undue influence, mistake, or other infirmity, or the parol evidence rule. This being the law, or the confused law on the proverbial shifting sands of joint accounts, there is much to be said for the dissent in the first Beehive case, since it seems

obvious that Painter 1) owned the money, 2) a gift or something tantamount thereto was intended if Mrs. Painter survived him, and 3) it was the undisputed intention of the parties that 1) and 2) supra should prevail,—and the trial court should have been affirmed under the procedure invoking the rules anent summary judgment and Mr. Painter's sworn statements having unrefutedly shown that he came within the existing law enunciated in the three cases mentioned above. There also is much to be said for the main opinion in the instant second appeal, since it cites Braegger v. Loveland and seems to agree with my dissent in the first Beehive case with respect to the procedure where the facts are uncontroverted. I dissent therefrom, however, since I dissented in Braegger v. Loveland and because the opinion is based, not on equitable principles but simply on proof of intention other than clearly expressed in the agreement, which proof would seem to be inadmissible on the part of the plaintiff or the intervener. But I can concur in the instant case in its remand, since such procedure would be proper under the cases that prevailed at the time the joint account in this case was created.

At the expense of being the one that everyone is out of step with but, I cannot agree with Mr. Justice Ellett's dissent, since he bases it on his theory that the garnishment broke up the joint account by destroying the "four unities of title, interest, time

and possession,"—a theory which this court rejected and laid at rest in Hanks v. Hales, supra, and because it seems to be discordant with the rule he espoused in his opinion in the first Beehive case.

In view of the history of joint accounts in this state, and the chronology of events anent thereto, I think this second Beehive case should be decided as the trial judge in the first case decided it: That at the time this case arose Mr. Painter, on the facts, pleading and the law, was, and consequently still is, the owner of all the funds in the joint account, for two reasons—that 1) he was the owner thereof under the cases applicable at the time to this account, 2) the undisputed evidence showed he was intended to be such under this case, and 3) he undisputedly is the survivor of the fund which all the cases, absent fraud and the like, which is not the case here, say he owns.

It would seem to this writer that the perennially troublesome problem of joint accounts might be resolved by a double-barreled spelled-out joint account agreement device in which the joint depositors agreed to own the funds in an amount represented by a fraction calculated according to their individual contributions, or in percentages to which they agree with the usual provision for complete and conclusive owner-

ship by the survivor as is found in joint account agreements generally and customarily employed, if not offensive to testamentary problems. Expanded laws along the lines of the present Savings and Loan legislation also might lend stability to such accounts and rescue them from the erstwhile shifting sands in which such accounts have been struggling to extricate themselves.[19]

I would reverse prospectively all previous cases inconsistent with Hobbs v. Fenton.

ELLETT, Justice (dissenting).

I dissent. This is the second appeal in this case. The facts were set out in the former opinion.[1] In substance, they are these:

Mr. and Mrs. Painter ostensibly had a joint bank account. Beehive State Bank as judgment creditor of Mrs. Painter attached the funds, claiming all of it. Mrs. Painter died, and Mr. Painter interpleaded himself and moved for a summary judgment for a release of all the funds. This motion was by the trial court granted, and on appeal we reversed, saying:

> If the contract between the parties ostensibly creates a joint tenancy relationship with full right of survivorship, there arises a presumption that such is the case unless and until some interested party

---

19. 19 Drake Law Review 229 (Dec. 1969).

1. Beehive State Bank v. Rosquist, 21 Utah 2d 17, 439 P.2d 468 (1968).

shows under equitable rules that the contract should be reformed to show some other agreement of the parties or that the contract is not enforceable because of fraud, mistake, incapacity, or other infirmity.

\*   \*   \*   \*   \*   \*

We are of the opinion that this case cannot be settled by a summary judgment based upon the undisputed evidence now before the court. The interest of Ila R. Painter in and to the fund while she was alive, if any she had, should be applied toward the satisfaction of the appellant's judgment against her.[2]

Pursuant to the remand another trial was had wherein Mr. Painter testified that he had deposited all of the funds in the account. The court thereupon signed a memorandum decision containing the following:

1. That the contract in the names of Fred L. Painter and Ila R. Painter created a joint tenancy relationship.

2. That the Intervener presented no evidence that the joint deposit contract should be reformed or varied or that the same was unenforceable.

3. That a garnishee judgment should be entered in favor of the plaintiff for the full amount of the joint account.

Thereafter, findings of fact, conclusions of law, and judgment were duly signed and filed awarding all of the fund to the Beehive State Bank. Mr. Painter has appealed from that judgment.

We held in the prior decision that the fund could be attached and that the interest therein, if any, of Mrs. Painter could be applied to the satisfaction of judgment against her.

The court apparently thought that because Mrs. Painter had the authority to draw all of the money from the account at the time the garnishment was served, the entire fund could be applied pursuant to the garnishment to the judgment creditor's account. This belief is not well founded. If a true joint tenancy relationship existed, as the court found it did, then there had to be four *unities* in existence between the joint tenants, viz.: unity of time, title, interest and possession. Each tenant must, therefore, have the same interest in and to the fund as do all other tenants therein.

In the former appeal we said that an ostensible joint tenancy relationship would be presumed to be just that unless the agreement could be reformed to show some other relationship or because of fraud, mistake, incapacity, or other infirmity which would prevent the enforcement of the agreement. Since there was no proof given at the trial which tended to show that the

2. 21 Utah 2d 17, 22, 439 P.2d 468, 471.

ostensible relationship of joint tenancy did not exist, it must be held that Mr. and Mrs. Painter were joint tenants, each having a one half interest in and to the funds. We think the following cases state the better rule of law as it applies to the instant matter:

In Dover Trust Co. v. Brooks, 111 N.J. Eq. 40, 160 A. 890 (N.J. Chancery 1932), court said:

* * * The service of the writ of attachment and the levy under execution worked a severance of Mr. and Mrs. Brooks' joint ownership in the account in question and made them tenants in common thereof and terminated the right of survivorship. The question then is: What was the extent of Brooks' interest as a tenant in common, taken under the attachment and execution? I do not think that the fact that the deposits and withdrawals made by Mr. and Mrs. Brooks were unequal in amount has any bearing in determining that question in this case, because by the form in which they opened and maintained the account for nine years, as each made a deposit in the account, he or she gave to the other an interest in such deposit co-extensive with the interest of the one making the deposit and each had equal rights with the other to draw against such deposits and to withdraw any part, or the whole of the account. I conclude that the attachment issued at Jones' suit and the execution issued on the judgment entered therein effected a severance of Mr. and Mrs. Brooks' joint interest in the account, and that they thereupon became tenants in common thereof in equal shares. The result is that one half of the fund in court should be ordered paid to Jones, or to the sheriff who holds the execution in his suit against Brooks, to apply on account of Jones' judgment, and that the other half should be ordered paid to Mrs. Brooks.

The Supreme Court of New Jersey approved the ruling of the Dover Trust Company case in the case of Republic of China v. Pong-Tsu Mow, 15 N.J. 139, 104 A.2d 322, 326 (1954), and said:

The effect of an attachment or execution against the interest of two owners of a joint account makes the owners tenants in common, and under such attachment or execution the debtor's interest in such an account may be seized. [Citation omitted.]

* * * The writ of attachment in this case has the effect of merely preserving the *status quo* until the determination of their principal's claim to ownership of the funds entrusted to them.

In American Oil Co. v. Falconer, 136 Pa. Super. 598, 8 A.2d 418, 421, 422 (1939), the court held:

It seems clear that the joint tenancy in this bank deposit is severable by the ac-

tion, voluntary or involuntary, of any one of the parties. The effect of the attachment execution is to sever the joint tenancy and to make William Falconer a tenant in common with his mother and sister, and the one-third of such deposit becomes liable to answer for the judgment of the plaintiff against the son. The plaintiff is entitled to a judgment against the garnishee for such sum not exceeding the one-third of the deposit as is necessary to satisfy its judgment against William Falconer.

An attachment in aid of execution of a judgment lawfully issued against the interest of a joint tenant destroys the unity of possession of that tenant, as he is deprived of any right to possession of the fund. The depositors become tenants in common; and the death of one of them thereafter does not affect the title to the interest held under the writ of garnishment.

I, therefore, do not think this case should be remanded for further proceedings. The parties have had their day in court, and it is my opinion that the plaintiff, Beehive State Bank, as judgment creditor of Mrs. Painter, is entitled to have one half of the fund applied to its judgment and Mr. Painter is entitled to the other half. I would reverse the ruling of the trial court and direct it to enter judgment as indicated above. The appellant should be awarded his costs.